IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| **RIGHT TO LIFE OF MICHIGAN**; **AMERICAN ASSOCIATION OF PRO-LIFE OBSTETRICIANS AND GYNECOLOGISTS**, on behalf of itself, its members, and their patients; **GINA JOHNSEN**, Representative, Michigan House of Representatives; **LUKE MEERMAN**, Representative, Michigan House of Representatives; **JOSEPH BELLINO, JR.**, Senator, Michigan Senate; **MELISSA HALVORSON, M.D.**; **CHRISTIAN MEDICAL AND DENTAL ASSOCIATIONS**, on behalf of itself, its members, and their patients; **CROSSROADS CARE CENTER**; **CELINA ASBERG**; **GRACE FISHER**; **JANE ROE**, a fictitious name on behalf of preborn babies; **ANDREA SMITH**; **JOHN HUBBARD**; **LARA HUBBARD**; **SAVE THE 1**, on behalf of itself and its members; and **REBECCA KIESSLING**, <br><br> Plaintiffs, <br><br> v. <br><br> **GRETCHEN WHITMER**, in her official capacity as Governor of the State of Michigan; **DANA NESSEL**, in her official capacity as Attorney General of the State of Michigan; and **JOCELYN BENSON**, in her official capacity as Secretary of State of the State of Michigan, <br><br> Defendants. | No. 1:23-cv-01189 <br><br><br> **FIRST AMENDED COMPLAINT** <br> [42 U.S.C. § 1983] <br><br> Hon. Paul L. Maloney <br><br> Magistrate Judge Ray Kent |

Plaintiffs Right to Life of Michigan, American Association of Pro-Life Obstetricians and Gynecologists, Representative Gina Johnsen, Representative Luke Meerman, Senator Joseph Bellino, Jr., Dr. Melissa Halvorson, Christian Medical and Dental Associations, Crossroads Care Center, Celina Asberg, Grace Fisher, Jane Roe, Andrea Smith, John Hubbard, Lara Hubbard, Save The 1, and Rebecca Kiessling, by and through undersigned counsel, bring this First

Amended Complaint against the above-named Defendants, their employees, agents, and successors in office, and in support thereof allege the following upon information and belief:

## INTRODUCTION

1.      This case seeks to protect and vindicate fundamental constitutional rights.  It is a civil rights action brought under the First and Fourteenth Amendments to the United States Constitution and the Guarantee Clause of the United States Constitution, challenging Proposal 3 and the super-right to "reproductive freedom" it created that is now Article I, § 28 of the Michigan Constitution.

2.      Article VI of the United States Constitution makes clear that our American Constitution is the Supreme Law of the land, protecting certain fundamental rights that cannot be abridged by government, including state governments, whether through legislation, ballot initiatives, or other official acts.

3.      The United States Constitution was designed to accomplish two primary and related goals: to prevent tyranny and protect liberty.  These important goals are advanced by Article IV, Section 4, which is a "guarantee" that each state will have a "Republican Form of Government" (Guarantee Clause).

4.      With the assistance of tens of millions of dollars from out-of-state special interest groups, which launched a massive, false, and deceptive ballot initiative campaign, Proposal 3 was passed by a simple majority of the Michigan electorate on November 8, 2022.

5.      The passage of Proposal 3 resulted in an amendment to the Michigan Constitution (Article I, § 28), which created a super-right to "reproductive freedom."  At no time in our nation's history has such a super-right, immune from all legislative action, ever been created by a popular vote outside of the checks and balances of a republican form of government.

6.      Proposal 3 added Article I, § 28 to the Michigan Constitution, which, *inter alia*, (1) causes great harm to women, particularly black women, as a class by exempting them from the legal protections afforded to other classes of individuals in violation of the equal protection guarantee of the Fourteenth Amendment; (2) deprives parents of the right to control and direct the upbringing and education of their minor children by excluding the parents from decisions regarding the education, protection, and medical treatment of their children involving "reproduction," which is very broad and includes decisions regarding abortion, contraception, "gender reassignment" medication/procedures, puberty blocking medications, sterilization (which includes "gender reassignment"), sexual activity, and other harmful decisions, in violation of the Fourteenth Amendment; (3) overrides any objections to advocating for, endorsing, providing, or supporting procedures involving "reproduction," such as abortion, contraception, "gender reassignment," puberty blocking, and sterilization, on religious grounds, thereby infringing the rights of conscience, religious exercise, and the freedom of speech protected by the First Amendment; and (4) violates the Guarantee Clause of the United States Constitution by nullifying the legitimate authority of a co-equal branch of government.

7.      Federal courts have recognized the propriety of a federal constitutional challenge to a statewide referendum passed by voters resulting in an amendment to a state constitution.  In 1992, a Colorado state constitutional amendment was adopted via a statewide referendum.  The proposal known as Amendment 2 (Colo. Const. art. II, § 30b) prohibited all legislative, executive, or judicial action at any level of state or local government designed to protect homosexual persons.  In *Romer v. Evans*, 517 U.S. 620 (1996), the U.S. Supreme Court held that Amendment 2 violated the equal protection guarantee of the Fourteenth Amendment on rational basis grounds (there was no fundamental right nor suspect class implicated, unlike in this case).

As stated by the Court, "A law declaring that in general it shall be more difficult for one group of citizens than for all others to seek aid from the government is itself a denial of equal protection of the laws in the most literal sense.  The guaranty of equal protection of the laws is a pledge of the protection of equal laws."  *Romer*, 517 U.S. at 633-34 (internal quotations and citations omitted).  Proposal 3 (Article I, § 28) fails for similar reasons, and others.

8.      Plaintiffs seek a declaration that the creation, adoption, implementation, and enforcement of Proposal 3, specifically including Article I, § 28 of the Michigan Constitution, violates Plaintiffs' fundamental rights under the United States Constitution; a permanent injunction enjoining the implementation and enforcement of Article I, § 28 of the Michigan Constitution; and an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and other applicable laws.

## JURISDICTION AND VENUE

9.      This action arises under the Constitution and laws of the United States. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1343.

10.      Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general legal and equitable powers of this Court.

11.      Plaintiffs' claim for an award of their reasonable costs of litigation, including attorneys' fees and expenses, is authorized by 42 U.S.C. § 1988 and other applicable law.

12.      Venue is proper under 28 U.S.C. § 1391(b) because the Michigan Governor, the Michigan Attorney General, and the Michigan Secretary of State are located in this judicial district and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

## PARTIES

13.     Plaintiff Right to Life of Michigan is a nonpartisan, nonsectarian, nonprofit organization of diverse and caring people united to protect the precious gift of human life from fertilization to natural death.  It operates as a 501(c)(4) organization and proposes, lobbies for, and supports legislation that protects the gift of human life.

14.     Right to Life of Michigan works on behalf of defenseless or vulnerable human beings, born and unborn, within its identified issues of abortion, infanticide, euthanasia and assisted suicide.

15.     Right to Life of Michigan has many programs that assist women in crisis pregnancy situations and/or help women to choose life for their unborn baby.  These programs result in the expenditure of the organization's resources, and the need for these programs has substantially increased as a result of Proposal 3 (and the creation of Article I, § 28), thereby resulting in the need to substantially increase the resources the organization must expend for these programs.

16.     As a result of the passage of Proposal 3 (and the creation of Article I, § 28), Right to Life of Michigan has had to devote significant resources to counteract its damaging effects.

17.     Right to Life of Michigan's programs include, *inter alia*, helping women find local resources for housing, counseling, healthcare, material assistance, and childcare/parenting assistance; providing grants to pregnancy resource centers that help women choose life for their babies and that provide medical assistance to pregnant women; sponsoring "baby showers" to provide pregnant women with material resources to assist with their pregnancies; and funding education programs that inform the public about the harm caused by abortion and that there are organizations and resources available to help pregnant women choose life.  Many of these

programs focus on assisting women in minority communities as these women are disproportionally targeted and thus harmed by the abortion industry.

18.     Right to Life of Michigan's activities include political action (*i.e.* getting pro-life politicians elected to local, state, and federal levels of government, specifically including the Michigan Legislature) through a PAC and full-time PAC Director.

19.     Right to Life of Michigan's activities also include advocating for the passage of laws that protect the unborn, and the organization employs two full-time employees for this purpose.

20.     The passage of Proposal 3 (and the creation of Article I, § 28) adversely affects Right to Life of Michigan's activities.  In particular, Right to Life of Michigan's legislative efforts are thwarted because lawmakers can no longer pass pro-life laws, and its political action is affected because even if pro-life politicians are elected, they are unable to change the law given the breadth of Article I, § 28 (also referred to herein as § 28 or Section 28).

21.     Right to Life of Michigan was instrumental in forming, and was a main source of funding for, Citizens to Protect MI Women and Children, a ballot question committee created to defeat Proposal 3.

22.     Section 28 undermines decades of work and accomplishments of Right to Life of Michigan—work to ensure that Michigan law protects mothers and respects all human life, born and unborn.  Section 28 stands as an impenetrable barrier to promoting legislation designed to protect women and the unborn, thereby undermining the efforts of Right to Life of Michigan.

23.     Plaintiff American Association of Pro-Life Obstetricians and Gynecologists (AAPLOG) is a nonprofit organization comprised of board certified, professional medical experts who practice in the field of Obstetrics and Gynecology (OBGYN).  AAPLOG has

members in Michigan, and it seeks relief on behalf of itself, its current and future Michigan members, and its members' patients that reside in or that will travel to Michigan for medical care and treatment.

24.     AAPLOG has current members, and will likely have future members, who work at state-operated hospitals and medical facilities, including the University of Michigan Health System (a state actor), and/or have credentials/hospital privileges in such facilities.  As a result, § 28 subjects these medical professionals to mandates that AAPLOG and its members object to based on medical ethics and their sincerely held religious beliefs, thereby causing injury to AAPLOG and its members.

25.     AAPLOG members would like to work at state-operated hospitals and medical facilities in Michigan and/or obtain credentials/hospital privileges in such facilities.  However, § 28 subjects them to mandates that AAPLOG and its members object to based on medical ethics and their sincerely held religious beliefs, thereby causing injury to AAPLOG and its members.

26.     AAPLOG's mission is to encourage and equip medical practitioners to provide an evidence-based rationale for defending the lives of both the pregnant mother and her unborn child.  AAPLOG and its members oppose abortion.

27.     AAPLOG's purpose is to reaffirm the unique value and dignity of individual human life in all stages of growth and development from fertilization onward.  Strong voices within our culture (and within the OBGYN professional College) espouse induced abortion on demand as a standard of care for unwanted pregnancies.  Often perinatologists are quick to recommend abortion as a "final solution" for "defective" in utero babies.  AAPLOG opposes these values.  AAPLOG views the physician's role as a caregiver, responsible, as far as possible, for the well-being of both the mother and her unborn child.

28.     AAPLOG is extremely concerned about the potential long term adverse consequences of abortion on a woman's future health.  AAPLOG realizes that, in the United States, including Michigan, reporting of both abortions and associated complications is generally not adequate to provide meaningful conclusions.  AAPLOG explores data from around the world regarding abortion associated complications (such as depression, substance abuse, suicide, other pregnancy associated mortality, subsequent preterm birth, placenta previa, and breast cancer) to provide a realistic appreciation of abortion-related health risks.

29.     The physician's right of conscience in medical decision-making is, and will continue to be, a crucial part of AAPLOG's advocacy on behalf of pro-life physicians as the organization and its members oppose, as a matter of conscience, induced abortion with the sole intent of ending the life of an embryonic or fetal human being as it is contrary to the very nature and purpose of medical care.  AAPLOG opposes § 28 because it forces its members to accept abortion as medical care contrary to its members' professional judgment, moral values, and consciences.  Accordingly, AAPLOG members fear the inevitable loss of medical licensure and other government-based regulatory harms due to § 28.  Section 28 also removes any statutory protection of their right of conscience and thus substantially interferes with fundamental constitutional liberty interests held by those who oppose abortion on moral and religious grounds.

30.     AAPLOG also advances the rights of its members' patients and potential patients, such as a baby born alive following a failed abortion.  Section 28 permits medical neglect to allow this baby to die, in violation of the child's inviolable right to life.

31.     As stated by the Supreme Court, "We have long permitted abortion providers to invoke the rights of their actual or potential patients in challenges to abortion-related

regulations." *June Med. Servs. L.L.C. v. Russo*, 140 S. Ct. 2103, 2118 (2020).  Here, AAPLOG, which is comprised of pro-life medical professionals, is invoking the rights of its members' actual or potential patients in this challenge to an "abortion-related" regulation.  As the Supreme Court further noted, "In such cases, we have explained, the obvious claimant and the least awkward challenger is the party upon whom the challenged statute imposes legal duties and disabilities." *Id*. at 2119.  Here, § 28 imposes "legal duties and disabilities" upon AAPLOG and its members regarding matters related to "reproduction."

32.     Plaintiff Gina Johnsen is a member of the Michigan House of Representatives. She represents the 78th House District.  Plaintiff Luke Meerman is also a member of the Michigan House of Representatives.  He represents the 89th House District.  Plaintiff Joseph Bellino, Jr. is a member of the Michigan Senate.  He represents the 16th Senate District.  These legislators (collectively referred to as Plaintiff Legislators) have actively worked, and would like to continue their work, through the Michigan Legislature, to propose and/or pass legislation protecting the unborn, protecting women from the harm of abortion, protecting the right of conscience of healthcare providers, and protecting parental rights, among other legislative initiatives designed to advance a pro-life agenda.  Plaintiff Legislators want to continue to work to pass legislation that advances these important state interests.  However, § 28 prevents them from doing so.

33.     Plaintiff Melissa Halvorson, M.D., is a pro-life physician and member of AAPLOG.  Plaintiff Halvorson is a board-certified OBGYN, and she opposes abortion, "gender reassignment," puberty blocking, and sterilization on religious grounds and as a matter of conscience as these services violate her sincerely held religious beliefs, and she opposes such services on medical grounds as they are harmful to her patients and potential patients.  Plaintiff

Halvorson opposes § 28 because it forces her to provide the objectionable services in violation of her sincerely held religious beliefs and her professional medical judgment, moral values, and conscience.  Plaintiff Halvorson fears the inevitable loss of her medical license and other government-based regulatory harms due to § 28.

34.     Plaintiff Halvorson opposes § 28 because it forces her to accept abortion as medical care contrary to her professional judgment, moral values, conscience, and religious beliefs.  Section 28 removes any statutory protection of her right of conscience and her right to object to providing medical procedures that are now a constitutional "right" under the Michigan Constitution for her patients and prospective patients, thus substantially burdening Plaintiff Halvorson's ability to practice medicine in accord with her professional medical judgment, moral values, and religious beliefs.

35.     Plaintiff Halvorson opposes § 28 because it harms women and preborn babies and thus causes unnecessary harm to her potential patients.

36.     Section 28 prevents Plaintiff Halvorson from working at state-operated hospitals and medical facilities in Michigan and/or obtaining credentials/hospital privileges in such facilities.

37.     Plaintiff Crossroads Care Center (Crossroads) is a pro-life, faith-based, non-profit organization committed to serving men and women by providing medical, educational, and support services and resources related to pregnancy and sexual health.  Crossroads is a member of AAPLOG, and it is located in Michigan.

38.     Crossroads offers a variety of medical services including pregnancy testing, ultrasounds, STD services, contraception information, early prenatal care, and post abortion

medical care.  The medical services are provided by licensed, trained medical staff.  All services are under the direction of a board-certified OBGYN.

39.     Due to the proliferation of unrestricted abortion on demand created by § 28, Crossroads is forced to expend additional and substantial resources to provide care for women harmed by abortion and for its education and counseling efforts to convince pregnant women to choose life for their unborn babies.  Section 28 undermines the efforts and operations of Crossroads.

40.     Crossroads is subject to state laws and regulations, which are now mandated by § 28 to protect and enforce the "right" to "reproductive freedom," which includes abortion and other objectionable medical procedures, thereby causing harm to Crossroads.

41.     Crossroads opposes § 28 because it will force the organization and those who work for and/or support it to endorse and support abortion, undermining Crossroads' efforts to provide services that will benefit and protect women and their unborn babies from the harm of abortion.  Indeed, § 28 will cause a proliferation of abortion and other harmful procedures that will harm the very women Crossroads is trying to help and protect from such harm.

42.     Crossroads opposes § 28 because it subjects the organization and those who work for and/or support it to penalties/regulatory harms if they refuse to accept abortion as medical care contrary to their professional judgment, moral values, consciences, and religious beliefs.

43.     Section 28 harms the women and their unborn babies who would otherwise receive services from Crossroads.

44.     Crossroads and those who work for and/or support the organization oppose abortion on religious grounds and as a matter of conscience as these services violate their sincerely held religious beliefs.  Crossroads and those who work for and/or support the

- 11 -

organization oppose § 28 because it forces them to accept, and/or provide support for, objectionable services in violation of their sincerely held religious beliefs.

45.     Section 28 removes any statutory protection of Crossroads' right to promote its pro-life values through its work and thus discriminates against those who oppose abortion on moral, religious, and scientific evidence grounds. Plaintiff Crossroads fears government-based regulatory harms, which are inevitable due to § 28.

46.     Plaintiff Christian Medical and Dental Associations (CMDA) is a nonprofit organization comprised of healthcare students as well as board-eligible and board-certified healthcare professionals, including experts in various medical fields.  CMDA has members in Michigan, and it seeks relief on behalf of itself, its current and future Michigan members, and its members' patients that reside in or that will travel to Michigan for medical care and treatment.

47.     CMDA educates, encourages, and equips Christian healthcare professionals to glorify God.  Christian healthcare professionals glorify God by following Christ, serving with excellence and compassion, caring for all people, and advancing Biblical principles of healthcare within the Church and throughout the world.

48.     CMDA opposes abortion on biblical, biological, ethical, medical, and sociological grounds.  CMDA and its members adhere to Christian principles of ethics and morality in their provision of healthcare.

49.     CMDA has current members, and will likely have future members, who work at state-operated hospitals and medical facilities, including, but not limited to, the University of Michigan Health System, and/or have credentials/hospital privileges in such facilities.  As a result, § 28 subjects these medical professionals to mandates that CMDA and its members object

to based on medical ethics and their sincerely held religious beliefs, thereby causing injury to CMDA and its members.

50.     CMDA members would like to work at state-operated hospitals and medical facilities in Michigan and/or obtain credentials/hospital privileges in such facilities.  However, § 28 subjects them to mandates that CMDA and its members object to based on medical ethics and their sincerely held religious beliefs, thereby causing injury to CMDA and its members.

51.     A healthcare professional's right of conscience in medical/healthcare decision-making is, and will continue to be, a crucial part of CMDA's advocacy on behalf of healthcare professionals as the organization and its members oppose, as a matter of conscience, abortion in every way as it is contrary to the very nature and purpose of healthcare.  CMDA opposes § 28 because it forces its members to accept abortion as medical care contrary to its members' professional judgment, moral values, consciences, and religious beliefs.  Section 28 also removes any statutory protection of their right of conscience and thus substantially interferes with fundamental constitutional liberty interests held by those who oppose abortion on moral and religious grounds.

52.     Plaintiff Celina Asberg is an adult citizen of the United States and a resident of Michigan.  Plaintiff Asberg was recently pregnant and plans to be pregnant again in the future and have more children.  She opposes § 28 because it immunizes from legal liability anyone who aids or assists with her prenatal care, childbirth, all aspects of her pregnancy, and her postpartum care (her "reproductive freedom") for any harm they may commit as a result of her pregnancy, prenatal care, delivery of her baby in childbirth, and postpartum care.  She also opposes § 28 because it lessens the standard of care for her prenatal care, pregnancy care, childbirth, and postpartum care, among others, as it legally changed the required consent for such care from

- 13 -

informed consent to only voluntary consent.  Plaintiff Asberg also sues on behalf of her future preborn baby and all preborn babies as a class, referred to herein as Jane Roe, and as their next friend.

53.    Below are true and correct ultrasound images of Plaintiff Asberg's preborn baby. One of the images shows the baby sucking his thumb.



54.    Plaintiff Asberg's son was born on August 13, 2023.

55.    Plaintiff Grace Fisher is an adult citizen of the United States and a resident of Michigan.  Plaintiff Fisher is currently pregnant and plans to be pregnant again in the future and have more children.  She opposes § 28 because it immunizes from legal liability anyone who aids or assists with her prenatal care, childbirth, all aspects of her pregnancy, and her postpartum care (her "reproductive freedom") for any harm they may commit as a result of her pregnancy, prenatal care, delivery of her baby in childbirth, and postpartum care.  She also opposes § 28 because it lessens the standard of care for her prenatal care, pregnancy care, childbirth, and postpartum care, among others, as it legally changed the required consent for such care from informed consent to only voluntary consent.  Plaintiff Fisher also sues on behalf of her preborn baby and all preborn babies as a class, referred to herein as Jane Roe, and as their next friend.

56.    Plaintiff Fisher has a sibling with a disability (Trisomy 18).  Plaintiff Fisher's parents were pressured to abort her sibling because of the disability.  Her parents refused.  Seeing this beautiful witness of her parents and the miraculous and beautiful life of her disabled sibling

has further convinced Plaintiff Fisher that abortion is an evil act of violence that targets the most innocent in our society.

57.     Plaintiff Jane Roe, a fictitious name, represents all those children in the womb who will be harmed by § 28, including those babies born alive who survive a failed abortion attempt by an abortion provider.  AAPLOG, CMDA, Plaintiff Asberg, and Plaintiff Fisher similarly represent the interests of Jane Roe in this litigation, as set forth above.  Jane Roe is a potential patient of members of AAPLOG and CMDA and child of Plaintiffs Asberg and Fisher. AAPLOG, CMDA, and Plaintiffs Asberg and Fisher sue on behalf of Jane Roe as her next friend.

58.     Plaintiffs Andrea Smith, John Hubbard, and Lara Hubbard are parents of minor children who attend public schools in Michigan (collectively referred to as Plaintiff Parents). Plaintiff Smith's daughter is a high school student (sophomore) in the Charlotte, Michigan public school system.  Plaintiffs John and Lara Hubbard have a daughter in elementary school (4th grade) and a daughter in middle school (7th grade) in the Grand Ledge, Michigan public school system.  Plaintiff Parents oppose § 28 because it removes from them the authority to control and direct the upbringing of their children by permitting school officials and others to aid and assist their children with obtaining contraception; procuring an abortion; seeking "gender reassignment," puberty blocking medication, or sterilization; and engaging in sexual intercourse or other sex acts, including with an adult, all without Plaintiff Parents' consent or knowledge and with impunity.  Pursuant to § 28, "[a]ll individuals," which includes minors, have a super-right to "reproductive freedom," which includes "all matters relating to pregnancy," thereby including acts necessary to become pregnant.  The state is powerless to regulate in this area as the

"individual's autonomous decision making" trumps any state interests, including those that would otherwise be considered "compelling."

59.     Section 28 offers Plaintiff Parents a Hobson's choice of either removing their children from public school (a state actor that is mandated to abide by § 28) or subjecting their children to sexual exploitation and related harms as a result of § 28.  This harm is exacerbated by the fact that the state has pushed to expand the presence of school-based health clinics.

60.     Section 28 also creates a Hobson's choice for Plaintiff Parents when it comes to making healthcare decisions for their children.  Plaintiff Parents are fearful about bringing their children to state-operated medical facilities, including the University of Michigan Health Care System, due to the risks of harm caused by § 28.  Moreover, the University of Michigan's policies prevent parents from accessing their minor child's medical records, thus exacerbating the harm.

61.     Plaintiff Save The 1 is a nonprofit, Michigan corporation.  It has a network of over 1,200 individuals who were conceived in rape and mothers who became pregnant by rape, plus hundreds of individuals who were told by doctors to abort their disabled children in the womb.  Save The 1 seeks relief on behalf of itself and its current and future Michigan members.

62.     Save The 1's mission is to educate everyone on why all preborn children should be protected by law and accepted by society, without exception and without compromise.  Further, it educates pro-life advocates, legislators, leaders, and clergy on how to articulate a proper defense of children conceived in rape or incest, as well as those with special needs.  It is a stark reality that unborn children with disabilities are disproportionately more likely to become victims of abortion.  As a result, abortion discriminates against disabled children.

63.    Save The 1's purpose is to demonstrate the value and dignity of life, specifically including the lives of its members, and to take the discussion of the "hard cases" from "concept" to "real life."  Save The 1 strives to reveal the truth that there have been tens of thousands of mothers pregnant by rape and tens of thousands of rape-conceived children all around us, and that there is help, support, and hope for all in those unfortunate circumstances.  Save The 1 knows that abortion is not the answer to a crisis pregnancy; it only creates a new crisis.

64.    Save The 1 provides a living witness to the fact that laws restricting abortion save lives worthy of living as many of the members of Save The 1 would not be here today but for legal restrictions on abortion.  Section 28 removes all such restrictions and undermines the efforts of Save The 1.

65.    Save The 1 expends resources on its outreach efforts, and these efforts have been significantly undermined by § 28.

66.    Plaintiff Rebecca Kiessling is an adult citizen of the United States and a resident of Michigan.  She is the Founder and President of Save The 1.  Rebecca was conceived from rape, and she loves her life.  Her birth mother, the victim of the horrible crime, wanted to abort Rebecca, but she did not do so because abortion was illegal.  Thus, Michigan law prohibiting abortion protected Rebecca and is *the* reason why she is alive today.  In fact, Rebecca's birth mother went to have an abortion on two separate occasions and only backed out each time because abortion was illegal.  Rebecca represents all those innocent unborn children who may be the second victims of a crime and who do not deserve to be killed because men raped their mothers.  Accordingly, Rebecca spends much of her time and talent advocating for laws that strictly limit the availability of abortion.  Section 28 is the most permissive abortion law in the country, undermining her efforts and those of Save The 1.

- 17 -

67.     Defendant Gretchen Whitmer is the Governor of Michigan.  As the Governor, she is sworn to uphold the Constitution and laws of the State of Michigan, including Article I, § 28 of the Michigan Constitution.

68.     Defendant Whitmer is the chief executive officer for the State of Michigan.  Her chief responsibility is to enforce state laws and regulations, including § 28.  As Governor, Defendant Whitmer is the head of the executive branch, which includes 20 administrative departments.  These departments include, *inter alia*, the Michigan Department of Civil Rights (MDCR), the Michigan Department of Health and Human Services, the Michigan Department of Licensing and Regulatory Affairs (LARA), and the Michigan Department of Education.  The executive departments also include the Michigan Department of Attorney General and the Michigan Department of State, which are headed by executive officials that are separately elected by Michigan voters.

69.     Defendant Whitmer is sued in her official capacity only.

70.     Defendant Dana Nessel is the Attorney General of Michigan.  As the Attorney General, she is responsible for enforcing and upholding the Constitution and laws of the State of Michigan, including Article I, § 28 of the Michigan Constitution.

71.     As the Attorney General, Defendant Nessel is the top lawyer for the State of Michigan.  When public legal matters arise, the Attorney General's Office renders opinions on matters of law, and provides legal counsel for the legislature and for each officer, department, board, and commission of state government.  The Attorney General's Office provides legal representation in court actions and assists in the conduct of official hearings held by state agencies.

72.     Defendant Nessel is sued in her official capacity only.

73.     Defendant Jocelyn Benson is the Secretary of State of Michigan.  As the Secretary of State, she is responsible for enforcing and implementing the ballot initiative procedures set forth in Article XII, § 2 of the Michigan Constitution.  Accordingly, Defendant Benson was responsible for enforcing and implementing the ballot initiative procedures that resulted in the passage of Proposal 3.

74.     Defendant Benson is sued in her official capacity only.

## STATEMENT OF FACTS

75.     On November 8, 2022, the Michigan voters passed Proposal 3 by a simple majority (56.7% supported the proposal and 43.3% opposed it).  Proposal 3 passed by a smaller majority (56.7% in favor) than the Michigan marriage amendment (58.6% in favor), which was eventually struck down by the U.S. Supreme Court in *Obergefell v. Hodges*, 576 U.S. 644 (2015).

76.     The primary political action committee that supported the passage of Proposal 3, Reproductive Freedom for All, contributed $47,835,464.79 to the passage of this proposal.  At least $34,000,000 of this funding came from out-of-state sources.  Consequently, most of the funding for the passage of Proposal 3 came from out-of-state supporters who wanted to influence the election and thus the policy outcome in Michigan with regard to this proposal.

77.     In comparison, the primary political action committee that opposed Proposal 3, Citizens to Protect MI Women and Children, contributed $21,065,062.08 to defeating this proposal.  Only a fraction (less than $300,000) of this funding came from out-of-state sources.

78.     The proponents of Proposal 3 launched a massive propaganda campaign, which was overwhelmingly funded by out-of-state money, that deceived Michigan voters into believing

that this proposed constitutional amendment (§ 28) would merely "Restore *Roe*."  It does no such thing.

79.     Proposal 3 is contrary to the strong public policy to protect innocent human life that prevailed in Michigan for many decades.  *People v. Kurr*, 654 N.W.2d 651, 654 (Mich. Ct. App. 2002) ("[F]etuses are worthy of protection as living entities as a matter of public policy."); *People v. Bricker*, 208 N.W.2d 172, 175 (Mich. 1973) ("It is the public policy of the state to proscribe abortion."); *see also People v. Ambrose*, 895 N.W.2d 198, 200 (Mich. Ct. App. 2016) ("[W]e respect the right of a fetus to calm and peaceful environmental circumstances without threat of harm to them.") (quoting trial court).

80.     Proposal 3 added § 28 to Article I of the Michigan Constitution.  Section 28 states as follows:

> (1) *Every* individual has a fundamental right to *reproductive freedom*, which entails the right to make and effectuate decisions about *all matters* relating to pregnancy, including *but not limited* to *prenatal care*, childbirth, postpartum care, contraception, sterilization, abortion care, miscarriage management, and infertility care.  An individual's right to reproductive freedom shall not be denied, burdened, nor infringed upon unless justified by a compelling state interest achieved by the least restrictive means.
>
> Notwithstanding the above, the state may regulate the provision of abortion care after fetal viability, provided that in no circumstance shall the state prohibit an abortion that, in the professional judgment of an attending health care professional, is medically indicated *to protect the life or physical or mental health of the pregnant individual*.
>
> (2) *The state shall not discriminate in the protection or enforcement of this fundamental right*.
>
> (3) *The state shall not penalize, prosecute, or otherwise take adverse action against an individual based on their actual, potential, **perceived**, or alleged pregnancy outcomes, including but not limited to miscarriage, stillbirth, or abortion.  Nor shall the state penalize, prosecute, or otherwise take adverse action against someone for aiding or assisting a pregnant individual in exercising their right to reproductive freedom with their voluntary consent.*

(4) For the purposes of this section:

A state interest is "compelling" *only* if it is for the limited purpose of protecting the health of an individual seeking care, consistent with accepted clinical standards of practice and evidence-based medicine, *and does not infringe on that individual's autonomous decision-making*.

"Fetal viability" means: the point in pregnancy when, in the professional judgment of an attending health care professional and based on the particular facts of the case, there is a significant likelihood of the fetus's sustained survival outside the uterus *without the application of extraordinary medical measures*.

(5) *This section shall be self-executing*.  Any provision of this section held invalid shall be severable from the remaining portions of this section.

Mich. Const. art. I, § 28 (emphasis added) (§ 28 or Section 28).

81.     Section 28 expressly provides that "[*e*]*very* individual," which includes minors, "has a fundamental right to *reproductive freedom*, which entails the right to make and effectuate decisions about *all matters* relating to pregnancy, including *but not limited to* prenatal care, childbirth, postpartum care, contraception, sterilization, abortion care, miscarriage management, and infertility care."  This broad right to "reproductive freedom" necessarily includes decisions involving gender and "gender reassignment" surgeries and other harmful procedures as well as decisions by minors to engage in sexual intercourse with adults.  There are no exceptions.

82.     The provisions of § 28 are "self-executing."  That is, the provisions do not need any legislation to implement them or any other action for them to become effective.

83.     Section 28(2) mandates the "state," which includes all departments of the executive branch and all state actors, including state-operated hospitals (*e.g.*, University of Michigan Public Health System), county hospitals, and public schools, including public school health clinics, to "protect[]" and "enforce[]" this very broad "fundamental right" to "reproductive freedom."

84.     As noted in the ballot proposal, the passage of Proposal 3 (now § 28) invalidated numerous state laws, including many laws that protect women, children, parental rights, and the right of conscience, among others.

85.     Section 28 expressly applies to all "individuals."   Under this constitutional provision, "every individual" is autonomous and possesses certain rights, including the right to "prenatal care."   All human beings, from their very beginning, are "individuals" with distinct, separate, and unique DNA.   Pursuant to § 28, all human beings, therefore, possess "reproductive freedom" and thus the right to "prenatal care."   The authors of § 28 specifically chose "individual" for purposes of this amendment, and this term is commonly defined as "of or relating to an individual, especially a single human."   *See American Heritage Dictionary*.   A preborn baby (Jane Roe and others similarly situated) is "a single human."

86.     Science teaches without reservation that human life begins at fertilization (conception).   It is a scientific fact that an organism exists after fertilization that did not exist before.   This new life has its own DNA distinct from its mother and father, meaning that it is a unique, individual, human life.   Indeed, this human life can have a sex (male) that is different from its mother (female).

87.     As the human embryo grows, it develops a heartbeat (22 days after fertilization), its own circulatory system, and its own organs.   From fertilization, it is a new organism that is alive and will continue to grow and develop as long as nutrition is provided and its life is not ended through illness or violence (such as abortion).

88.     The new life, which is indisputably human as it has human DNA, is viable (can live outside of its mother's womb) and can feel pain as early as 24 weeks after gestation.   In fact,

the evidence suggests that this human life can feel pain as early as the first trimester.  Section 28 redefines viability to ensure the demise of this human life.

89.    This new human life has an interest in "life."  And this interest is protected by the Due Process and Equal Protection Clauses of the Fourteenth Amendment.

90.    Below is a true and accurate image of a preborn baby alive in the womb at 12 weeks following fertilization.  This image is indisputable proof that this new life is a human life. And this innocent human life deserves the full protection of the law.



91.    For the law to turn a blind eye to the existence of this innocent human life and thus deny it the legal protection every human life deserves defies irrefutable biological facts, logic, and commonsense, and it is nothing short of evil.

92.    The Fourteenth Amendment bars states from depriving "any person of life" "without due process of law" or denying "to any person" "the equal protection of the laws."  This includes preborn human "life."

93.    The Fourteenth Amendment was adopted against a backdrop of established common-law principles, legal treatises, and statutes recognizing unborn children as persons possessing fundamental rights.

94.     Authoritative treatises—including those deployed specifically to support the Civil Rights Act of 1866, which the Fourteenth Amendment aimed to sustain and enhance—prominently acknowledged the unborn as persons with legal rights, including the right to life. Leading eighteenth-century English cases, later embraced in authoritative American precedents decades before ratification of the Fourteenth Amendment, declared the general principle that unborn humans are rights-bearing persons from conception.  And even before statutory prohibitions on abortion appeared throughout the nation in the mid-nineteenth century, the common law firmly regarded abortion as an offense from the moment when a new individual member of the human species emerged.  Once a unique, distinct human being came into existence (based in large measure on the understanding of science at the time) that life was protected from abortion.

95.     The only counterarguments to the claim that the Fourteenth Amendment includes all human life, including the preborn, were set forth in *Roe v. Wade*, 410 U.S. 113 (1973).  But these counterarguments rest on groundless extrapolations and stark historical falsehoods subsequently exposed in unanswered academic scholarship.  Indeed, the Supreme Court in *Dobbs v. Jackson Women's Health Organization*, thoroughly dismantled and discredited *Roe v. Wade*, noting that "*Roe* was egregiously wrong from the start.  Its reasoning was exceptionally weak, and the decision has had damaging consequences."  *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2243 (2022).

96.     Section 28 is internally inconsistent.  On one hand, § 28 expressly provides the right to "prenatal" care to "every individual"—that is, to every human being, which includes the preborn—and on the other hand, § 28 strips this individual of the most fundamental right—the right to life—by allowing abortion, which is the opposite of "prenatal care."

97.     Accordingly, § 28 creates several untenable dilemmas, forcing medical personnel and others, including Plaintiffs involved in the medical profession, to choose among opposing and impossibly inconsistent courses of action.  Because § 28 is internally inconsistent, it violates fundamental principles of due process in violation of the Fourteenth Amendment.

98.     Among the most fundamental protections of due process is the principle that no one may be required at peril of life, liberty, or property to speculate as to the meaning of a law. All are entitled to be informed as to what the law commands or forbids.  Section 28 violates this fundamental principle of due process.

99.     The following is a list of some of the Michigan laws that were invalidated or otherwise repealed, nullified, or revised following the passage of § 28: Mich. Comp. Laws § 750.14 (criminal ban on abortion); Mich. Comp. Laws § 750.15 (abortion, drugs, or medicine; advertising or sale to procure; misdemeanor); Mich. Comp. Laws § 750.40 (private diseases; conceptive preventatives; publication of cures); Mich. Comp. Laws § 750.322 (manslaughter; willful killing of unborn quick child); Mich. Comp. Laws § 722.901, *et seq*. (The Parental Rights Restoration Act); Mich. Comp. Laws §§ 333.17015 & 333.17015a (informed consent laws, including 24 hour waiting period and prohibition on coercive abortions); Mich. Comp. Laws § 333.20115 (clinical licensing); Mich. Comp. Laws §§ 550.541 to 550.551 (abortion insurance opt-out); Mich. Comp. Laws §§ 333.1071, *et seq*. (Born Alive Infant Protection Act); Mich. Comp. Laws § 333.2836 (disposal of fetal remains); Mich. Comp. Laws § 333.1091 (family planning or reproductive services; allocation of funds); Mich. Comp. Laws § 400.109a (ban on Medicaid funding of abortion); Mich. Comp. Laws §§ 722.851, *et seq*. (The Michigan Surrogate Parenting Act); Mich. Comp. Laws § 750.90h (Partial Birth Abortion Ban Act); Mich. Comp. Laws § 750.520b (statutory rape law); Mich. Comp. Laws § 388.1766 (public school abortion

policy prohibiting referral of a student for abortion); Mich. Comp. Laws §§ 333.2835 & 333.2837 (abortion reporting and abortion complication reporting); Mich. Comp. Laws §§ 333.20181 & 333.20183 (hospital and physician immunity from having to perform abortions); Mich. Comp. Laws § 600.2971 (ban on wrongful birth lawsuits); Mich. Comp. Laws § 390.1951, *et seq*. (establishes "the pregnant and parenting student services fund"); Mich. Comp. Laws § 206.30(2)(c) (The Stillborn Tax Equity); Mich. Comp. Laws § 333.9141 (authorizing grants for ultrasound equipment, but prohibiting grants for elective abortion use).

100.    Recently, Democratic members of the Michigan Legislature passed and Defendant Whitmer signed into law the Reproductive Health Act, which codified the provisions of § 28 and affirmatively repealed certain laws, including Mich. Comp. Laws § 750.90h (the ban on partial-birth abortion); Mich. Comp. Laws § 750.323 (quick child law); Mich. Comp. Laws §§ 550.541-550.551 (abortion insurance opt-out); Mich. Comp. Laws § 333.2835 (abortion reporting); Mich. Comp. Laws § 333.2836 (disposal of fetal remains); Mich. Comp. Laws § 333.2837 (abortion complication reporting); Mich. Comp. Laws § 333.17014 (legislative findings for informed consent); Mich. Comp. Laws § 333.17016 (partial birth abortion ban) (health code); and Mich. Comp. Laws §§ 333.20115 & 333.22224 (clinic licensing).  As a result of § 28, Plaintiff Legislators are powerless to repeal the Reproductive Health Act or pass laws seeking to mitigate the harm caused by this law.

101.    As a direct result of § 28, the Michigan Legislature recently and affirmatively repealed the law (Mich. Comp. Laws § 388.1766) that prevented school personnel from referring a student for an abortion or assisting a student with obtaining an abortion, thereby causing harm to minors and further undermining parental rights.

102.    By the express language of § 28, which grants broad "reproductive freedom" to "every individual," including minors, the Michigan Legislature is without power to restrict statutory rape.   Under § 28, a minor is capable of consenting to, *inter alia*, abortion, sexual intercourse, "gender reassignment," the use of contraception, and sterilization.   Those who aid and assist the minor can do so with impunity because any efforts by the state to deny, burden, or infringe the "individual's autonomous decision-making" in the area of "reproductive freedom" run afoul of § 28.

103.    Section 28 removes all state law protections for (actual or perceived) pregnant women harmed by exercising their right to reproductive freedom, which § 28 defines as including, *inter alia*, "prenatal care, childbirth, postpartum care" and "miscarriage management."

104.    Section 28 lessens the standard of care for the health of a woman harmed by an abortion (or anyone aiding or assisting with the abortion) for which she gave her "voluntary consent," whether or not the consent was informed.

105.    Section 28 prevents the state from enacting or enforcing laws that protect women from the harm of abortion, including laws that require informed consent or waiting periods, laws that regulate the safety and credentials of abortion clinics, and laws that regulate the licensing and credentials of abortionists, among others.

106.    Section 28 disproportionally harms the black community.   Blacks comprise approximately 13.5% of Michigan's population, yet 54% of all abortions performed on Michigan women in 2022 were on black women.

107.    The black community is a target of the abortion industry, which often locates surgical abortion centers in poor black neighborhoods, as is the case in Michigan.   In fact, of the 14 surgical abortion centers in Michigan, eight are located in black neighborhoods.   This is not

surprising as abortion has racist and eugenic roots.   Margaret Sanger, the founder of Planned Parenthood, the nation's largest abortion provider, was a well-known eugenicist.   In her concluding chapter of *The Pivot of Civilization*, Sanger wrote, "Every single case of inherited defect, every malformed child, every congenitally tainted human being brought into this world is of infinite importance to that poor individual; but it is of scarcely less importance to the rest of us and to all of our children who must pay in one way or another for these biological and racial mistakes."  (*See* https://rtl.org/educational-materials/margaret-sanger/).

108.    Section 28 prevents the Michigan Legislature from regulating or prohibiting abortion practices that target an individual (mother or unborn child) based on race, sex, or disability.

109.    Science teaches that only women can become pregnant.  This is a biological fact.

110.    Abortion is a violent act that results in the death of an innocent human life.  It is an intentional and overt act that destroys vulnerable human life.  It is not healthcare.

111.    Section 28 permits abortion on demand through all nine months of pregnancy, and it permits medical neglect leading to the death of a fetus born after an initial failed abortion attempt as this is the continuation of the "individual's autonomous decision-making" to exercise her right to "reproductive freedom" by aborting her baby.

112.    Section 28 permits any method for aborting a child as any regulation on abortion, including the methods used to procure the abortion, is subject to the "individual's autonomous decision-making."   In other words, the desire to procure an abortion trumps any regulation of abortion and those who provide it.

113.    As a result of § 28, the Michigan Legislature, and thus the people of Michigan, through their duly elected representatives, including Plaintiff Legislators, are unable to regulate

abortion (or sterilization, contraception, and a host of other matters involving "reproductive freedom") in any way.  Even if the state can present a "compelling interest" for legislation that regulates abortion for the health and safety of the mother or for the protection of viable and innocent human life or for any other legitimate interest, this interest is trumped by the "autonomous decision" to have an abortion or the exercise of any of the other broadly construed "reproductive freedoms."  Never has such a super-right been created under a state constitution— a right that removes the legislative branch from the process of governing and thus deprives Plaintiffs of their fundamental rights, including the right to a republican form of government.

114.    The U.S. Supreme Court has identified legitimate state interests for regulating abortion (and thus legislating in this area of the law), including, among others, "respect for and preservation of prenatal life at all stages of development . . .; the protection of maternal health and safety; the elimination of particularly gruesome or barbaric medical procedures; the preservation of the integrity of the medical profession; the mitigation of fetal pain; and the prevention of discrimination on the basis of race, sex, or disability." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2284 (2022) (internal quotations and citations omitted).  Section 28 does not permit the Michigan Legislature to advance any of these legitimate interests (including those interests deemed compelling) for regulating abortion as any such interests are subordinate to the newly-created, super-right to "reproductive freedom" and the "autonomous decision-making" of individuals to exercise that right.

115.    Section 28 prohibits the state from punishing or holding liable anyone who harms a woman through abortion so long as there was voluntary consent at some point.  Thus, a woman who is substantially harmed by a person performing the abortion—whether the person is qualified or not or uses safe procedures or not—has no state protection under the law to prevent

or remedy any harm to her if she provided voluntary consent to the procedure because § 28 effectively immunizes any person performing an abortion from such liability under the circumstances.  Likewise, a baby born alive following a failed abortion attempt, and then left to die by the aborting individual, has no state protection under the law to prevent or remedy any harm.  Section 28(3) expressly prohibits the state from "*penalize[ing], prosecut[ing], or otherwise take[ing] adverse action against someone for aiding or assisting a pregnant individual in exercising their right to reproductive freedom with their voluntary consent.*"  No exceptions exist.  Consequently, women who are or could become pregnant and babies, preborn and born following a failed abortion, are deprived of the equal protection of the law by § 28.

116.    Section 28 withdraws from women specific legal protections for the injuries caused by abortion or other "reproductive" matters.

117.    Section 28 is so broad that a woman whose "reproductive freedom" involves having a child is denied the equal protection of the law if she or her baby is harmed by anyone "aiding or assisting" with the pregnancy.

118.    Pursuant to § 28, a woman could "voluntarily consent" to a coat-hanger abortion and would have no state protection or remedy for the harm caused by the person performing the abortion.  The same woman could "voluntarily consent" to having a non-physician "aid or assist" (*i.e.*, perform) the abortion (*e.g.*, having a boyfriend perform a coat-hanger abortion on a kitchen table), and the woman would have no state protection or remedy under the law should she be harmed in the process.

119.    Section 28 permits women to seek abortions from non-physicians as the state is without power to restrict the performance of abortions to licensed medical professionals as the women's "autonomous decision-making" trumps all attempts to regulate abortion.

120.    Pursuant to § 28, *anyone* can assist a pregnant woman with an abortion with her "voluntary consent."  The state is unable to deny, burden, or infringe upon the "right" to an abortion as all state interests, including those that are compelling, are overridden by an individual's "right" to choose abortion (*i.e.*, the individual's "autonomous decision-making"). This essentially legalizes coat-hanger and back-alley abortions by non-qualified individuals.

121.    In addition, since the state cannot prosecute, penalize, or otherwise take adverse action against another for assisting a pregnant individual with an abortion, the state cannot enact legislation to protect women by ensuring that they in fact gave their "voluntary consent."  Quite literally, a pimp or sex trafficker or abusive boyfriend/husband could "aid" or "assist" the woman with her abortion, and the person could do so with impunity.

122.    Section 28 also harms women by changing the standard of care for "matters relating to pregnancy" from "informed consent" to simply "voluntary consent."

123.    "Gosnell-like" abortion clinics are possible because the state no longer has the ability to inspect and license a clinic to advance a "compelling" interest as this authority is eliminated by § 28.

124.    Like the effects caused by the legalization of marijuana, § 28 will result in abortion shops springing up across the state as abortion—which is a profit-driven business—is now unregulated.

125.    On October 23, 2023, Defendant Nessel, along with other pro-abortion attorneys general, signed an open letter falsely accusing pro-life pregnancy centers of spreading "misinformation and harm."  In this letter, Defendant Nessel and her fellow pro-abortion attorneys general express concern about the rise of "anti-abortion crisis pregnancy centers (CPCs)" that they falsely claim are "misleading consumers and delaying access to critical, time-

sensitive reproductive healthcare."   In this letter, Defendant Nessel and her pro-abortion companions state that they "oppose efforts by CPCs to mislead consumers and delay or impede access to the full spectrum of reproductive healthcare, including abortion," and that they will take "numerous actions aiming to mitigate the harmful effects of CPC misinformation and delays."   Section 28 empowers Defendant Nessel to take her threatened action, including regulatory action, to harm crisis pregnancy centers, including Crossroads, and to force them to accept abortion as a legitimate form of "healthcare" and to advocate a viewpoint that favors abortion.   Defendant Nessel opposes the fact that these pro-life centers convince women to protect their unborn children from abortion, and the fact that they provide much needed services to inform women of the harm caused by abortion to them and their unborn children.   Through these false claims and threatened action against crisis pregnancy centers, Defendant Nessel and others are doing the bidding of the abortion industry, which provides major donations to their political campaigns, because these pro-life centers undermine the profits of the abortion industry through the centers' pro-life efforts.

126.   As a direct result of § 28, Defendants consider those medical professionals who advocate in opposition to abortion, including crisis pregnancy centers such as Crossroads, to be engaging in "disinformation" and thus consumer fraud.   This is significant as the Department of Attorney General operates a Consumer Protection Team to fight consumer fraud, and it has an online Consumer Complaint form to submit such complaints to the Department of Attorney General.   This has a chilling effect on the speech of those medical professionals, including Plaintiffs, who oppose abortion based on medical ethics and sincerely held religious beliefs.

127.   The Michigan Consumer Protection Act, which is enforced by the Department of Attorney General and thus Defendant Nessel, makes it unlawful to engage in alleged consumer

fraud.  *See* Mich. Comp. Laws § 445.903.  Section 28 provides the mechanism and basis for enforcing this law against pro-life medical professionals, including Plaintiffs.

128.    Section 28 permits minors to make independent medical decisions and obtain medical treatment involving "reproduction," which includes abortion, contraception, "gender reassignment" medication/procedures, sterilization (which includes "gender reassignment"), and other harmful medical decisions, without requiring parental consent.

129.    School officials or medical professionals could aid or assist a minor with procuring an abortion, obtaining contraception, obtaining "gender reassignment" medication or procedures, and becoming sterilized without parental consent.  These officials/professionals could do so with impunity because of § 28.

130.    Section   28   makes   abortion,   contraception,   "gender   reassignment" medication/procedures, sterilization, puberty blockers, and other harmful medical procedures constitutional rights (and thus civil rights) as a matter of state law.

131.    Section 28 incentivizes individuals who support abortion, sterilization practices, and "gender reassignment" medication and procedures, among others, to force physicians and other medical professionals, such as Plaintiff medical professionals, to advocate for and provide such objectionable services under threat of complaints to state entities, including the MDCR and LARA, which inevitably will result in the loss of licensure and other regulatory harms for the objecting professionals as the state is now mandated to protect and enforce this new civil right to "reproductive freedom."

132.    Michigan's Elliot-Larsen Civil Rights Act (hereinafter Civil Rights Act), which is enforced through the executive branch of government headed by Defendant Whitmer, prohibits any discrimination based on "sex, sexual orientation, gender identity or expression."   Mich.

Comp. Laws. § 37.2102.  Section 28 provides that "[t]he state shall not discriminate in the protection or enforcement of" the "right to reproductive freedom."  The Civil Rights Act permits government and private enforcement of § 28 against private individuals and entities who oppose this new civil right to "reproductive freedom," including Plaintiff medical professionals.

133.    Individuals are already making complaints and threats of complaints to MDCR that faith-based medical professionals are depriving them of their civil rights by denying the individuals medical treatment related to "gender reassignment."  The risk of such complaints (and complaints for refusing to advocate for and provide other objectional medical procedures that are now constitutional "rights" under § 28) against Plaintiff medical professionals is concrete, real, and imminent.

134.    Similarly, § 28 provides a basis for MDCR and LARA (which regulates health professional licensing) to revoke the licenses of medical professionals and/or to punish these professionals, such as Plaintiff medical professionals, or their businesses, such as Crossroads, for objecting to providing or recommending abortion, sterilization, or "gender reassignment" medication or procedures, among other procedures involving "reproductive freedom."

135.    Section 28 is being used by Defendant Whitmer to advance her pro-abortion policies, which include, *inter alia*, the repeal of longstanding health regulations and safety standards for abortion clinics and the repeal of laws that require licensing and inspection.

136.    Accordingly, § 28 is being used to remove common-sense provisions meant to protect women, including minors, who are seeking or undergoing an abortion, as well as basic parental rights.  This blatant affront to women's health and safety has the primary goal of expanding the abortion industry's bottom line.  Efforts to stop these harmful policies through legislation run headlong into the super-right to "reproductive freedom" created by § 28.

137.    Several Michigan abortion clinics recently filed a lawsuit in the Michigan Court of Claims against the Michigan Attorney General and others, challenging Michigan's informed consent and waiting period laws and the law prohibiting anyone other than a physician from providing abortions, arguing that the laws violate § 28.  Most notably, the abortion clinics assert that § 28 "explicitly dictates that the State can never advance a compelling state interest in patient health via means that intrude 'on [an] individual's autonomous decision-making.'" *Northland Family Planning Clinic v. Dana Nessel*, Case No. 24-000011-MM (Mich. Ct. Claims filed Feb. 6, 2024).

138.    A pure democracy enables the tyranny of a voting majority to make law while leaving the rights of the minority largely unprotected.

139.    In a republican form of government, laws are made by representatives chosen by the people, and these laws must comply with a constitution that specifically protects the rights of the minority from the tyranny of an unchecked majority.

140.    Pursuant to Article XII, § 2 of the Michigan Constitution, "Amendments may be proposed to this constitution by petition of the registered electors of this state."  Accordingly, these amendments are permitted by a simple majority vote.

141.    Pursuant to Article XII, § 2, a simple majority could approve amending the Michigan Constitution to eliminate the Legislative Branch.

142.    In discussing the Guarantee Clause, James Madison emphasized the federal government's obligation to ensure that states maintain a republican form of government: "In a confederacy founded on republican principles, and composed of republican members, the superintending government ought clearly to possess authority to defend the system against aristocratic or monarchial innovations. . . . *But a right implies a remedy*; and where else could

the remedy be deposited, than where it is deposited by the Constitution?"  The Federalist No. 43 (James Madison) (emphasis added).

143.    The United States Constitution guarantees each state a republican form of government because our Founding Fathers understood and knew well that a pure democracy where a simple majority rules inevitably leads to a tyranny of the majority.

144.    While the Guarantee Clause does not generally provide the basis for a justiciable claim, Professor Erwin Chemerinsky observed that

> the time is clearly approaching in which the [Supreme] Court may be quite willing to reject the view that cases under the Guarantee Clause should always be dismissed on political questions grounds. . . .  [T]he Guarantee Clause should be regarded as a protector of basic individual rights and should not be treated as being solely about the structure of government.    Accordingly, judicial interpretation and enforcement is in accord with the preeminent federal judicial mission of protecting individual rights and liberties.

Erwin Chemerinsky, *Cases under the Guarantee Clause Should Be Justiciable*, 65 U. Colo. L. Rev. 849, 851 (1994).  In other words, a threat to individual liberty exists when the checks and balances of a republican form of government are thwarted by a process that lacks such protections or when the process creates for itself immunity from such protections, as is the case with Proposal 3 and thus § 28.

145.    A challenge to a provision passed pursuant to the process of amending the Michigan Constitution that nullifies the legitimate authority of a coordinate branch of government, such as the removal of the legislative branch altogether or, in the case of Proposal 3 (§ 28), prohibiting it from regulating or governing in a broad area of the law ("reproduction") that has historically been within its legitimate domain is justiciable under the Guarantee Clause. When a state adopts one non-republican feature, this feature alone may be invalid under the Guarantee Clause, as in this case.

146.    Proposal 3, which creates an unprecedented, super-right to "reproductive freedom" that reigns immune from legislative action, deprives Michigan citizens/residents, including Plaintiffs, of the right to a republican form of government guaranteed by the United States Constitution.

## FIRST CLAIM FOR RELIEF

### (Fourteenth Amendment—Equal Protection)

147.    Plaintiffs hereby incorporate all stated paragraphs.

148.    By reason of Article I, § 28 of the Michigan Constitution, which was created, adopted, and enforced under the color of state law and authority, Defendants have deprived Plaintiffs, specifically including women, and in particular pregnant women; preborn human beings, including Jane Roe and similarly situated individuals; preborn human beings who are black and/or have disabilities; partially born human beings; and human beings born following a failed abortion, of the equal protection of the law guaranteed under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

149.    Article I, § 28 deprives women of the equal protection of the law by denying them specific legal protections from harm and injuries caused by unregulated abortion and other "reproductive" matters.

150.    Article I, § 28 deprives preborn human beings, including Jane Roe and similarly situated individuals, preborn human beings who are black and/or have disabilities, and partially born human beings of the right to life and liberty and thus deprives them of the equal protection of the law.

151.    Proportionally, abortion harms black preborn human beings at a far greater rate than other races.  Accordingly, Article I, § 28 discriminates against individuals based on race in violation of the equal protection guarantee of the Fourteenth Amendment.

152.    Proportionally, abortion harms preborn human beings with disabilities at a far greater rate than those without disabilities.  Accordingly, Article I, § 28 discriminates against individuals with disabilities in violation of the equal protection guarantee of the Fourteenth Amendment.

153.    Article I, § 28 changes the standard of reproductive medical care from "informed consent" to merely "voluntary consent," and it prohibits the Michigan Legislature from enacting any meaningful health and safety regulations designed to protect women who seek such care, without any rational basis for doing so in violation of the equal protection guarantee of the Fourteenth Amendment.  Moreover, this change specifically harms women without any legitimate state interest, in violation of the equal protection guarantee of the Fourteenth Amendment.

154.    Article I, § 28 favors those medical professionals that advocate for abortion, contraception, "gender reassignment" medication/procedures, sterilization, puberty blockers, and other harmful medical procedures and disfavors those medical professionals, including Plaintiff medical professionals, who oppose such harmful medical procedures based on their sincerely held religious beliefs and medical ethics, which are grounded in those beliefs, in violation of the equal protection guarantee of the Fourteenth Amendment.

155.    Article I, § 28 deprives a human baby born alive following a failed abortion the equal protection of the law by denying him or her the specific legal protections from harm and

injuries (caused by abortion and other "reproductive" matters) available to similarly situated human babies born alive, in violation of the Fourteenth Amendment.

156. As a direct and proximate result of Article I, § 28 and its enforcement by Defendants, Plaintiffs have suffered irreparable harm, including the loss of their right to the equal protection of the law guaranteed by the Fourteenth Amendment, entitling them to declaratory and injunctive relief.

**SECOND CLAIM FOR RELIEF**

**(Fourteenth Amendment—Parental Rights)**

157. Plaintiffs hereby incorporate all stated paragraphs.

158. Article I, § 28 of the Michigan Constitution, which was created, adopted, and enforced under the color of state law and authority, interferes with the liberty interests of parents and guardians, specifically including Plaintiff Parents, to control and direct the upbringing and education of their children in violation of the Fourteenth Amendment and 42 U.S.C. § 1983.

159. Article I, § 28 permits individuals, including public school officials, medical professionals, and others, to aid or assist a minor child with procuring an abortion, obtaining contraception, obtaining "gender reassignment" medication or procedures, and becoming sterilized without parental knowledge or consent and with impunity in violation of Plaintiffs' parental rights protected by the Fourteenth Amendment.

160. Article I, § 28 permits adults to engage in sexual acts with minors so long as the minor "consents," thereby undermining the right of parents to control and direct the upbringing of their children in violation of Plaintiffs' parental rights protected by the Fourteenth Amendment.

161.    As a direct and proximate result of Article I, § 28 and its enforcement by Defendants, Plaintiffs have suffered irreparable harm, including the loss of their parental rights protected by the Fourteenth Amendment, entitling them to declaratory and injunctive relief.

### THIRD CLAIM FOR RELIEF

### (First Amendment—Free Exercise)

162.    Plaintiffs hereby incorporate all stated paragraphs.

163.    By reason of Article I, § 28 of the Michigan Constitution, which was created, adopted, and enforced under the color of state law and authority, Defendants have deprived Plaintiffs of their rights of conscience and to the free exercise of religion and religious expression protected by the First Amendment as applied to the states and their political subdivisions under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

164.    Article I, § 28 nullifies all statutory protection provided to physicians and other medical professionals, including those who work for and with Crossroads, who object to abortion, contraception, "gender reassignment" medication/procedures, sterilization, puberty blockers, and other harmful medical procedures related to "reproduction" on moral and religious grounds in violation of their sincerely held religious beliefs.

165.    Article I, § 28 mandates medical professionals, including Plaintiff medical professionals, to advocate for, support, endorse, and/or provide abortion, contraception, "gender reassignment" medication/procedures, sterilization, puberty blockers, and other harmful medical procedures in violation of their sincerely held religious beliefs.

166.    Article I, § 28 favors those medical professionals that advocate for abortion, contraception, "gender reassignment" medication/procedures, sterilization, puberty blockers, and

other harmful medical procedures and disfavors those medical professionals, including Plaintiff medical professionals, who oppose such harmful medical procedures based on their sincerely held religious beliefs and medical ethics, which are grounded in those beliefs.

167.    As a direct and proximate result of Article I, § 28 and its enforcement by Defendants, Plaintiffs have suffered irreparable harm, including the loss of their rights of conscience and to the free exercise of religion and religious expression protected by the First Amendment, entitling them to declaratory and injunctive relief.

## FOURTH CLAIM FOR RELIEF

### (First Amendment—Freedom of Speech)

168.    Plaintiffs hereby incorporate all stated paragraphs.

169.    By reason of Article I, § 28 of the Michigan Constitution, which was created, adopted, and enforced under the color of state law and authority, Defendants have deprived Plaintiffs of their right to freedom of speech protected by the First Amendment as applied to the states and their political subdivisions under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

170.    Article I, § 28 favors those medical professionals that advocate for abortion, contraception, "gender reassignment" medication/procedures, sterilization, puberty blockers, and other harmful medical procedures and disfavors those medical professionals, including Plaintiff medical professionals, who oppose such harmful medical procedures based on their sincerely held religious beliefs and medical ethics, which are grounded in those beliefs.

171.    Article I, § 28 operates as a content- and viewpoint-based restriction on the speech of medical professionals, including Plaintiffs, in violation of the First Amendment.

172.    Article I, § 28 is government-sanctioned discrimination and censorship of free speech in violation of the First Amendment.

173.    Article I, § 28 confers broad powers of censorship to government entities, which include, but are not limited to, MDCR, LARA, the Department of Education, the Department of Attorney General, public schools, and state-operated healthcare facilities, which can ban, censor, chill, regulate, or otherwise restrict constitutionally protected speech and engage in discriminatory practices with impunity based on that speech by virtue of the power conferred by § 28, in violation of the First Amendment.

174.    Article I, Section 28 permits government entities to censor, chill, regulate and otherwise restrict Plaintiffs' speech based on the content and viewpoint expressed by Plaintiffs' message in violation of the First Amendment.

175.    As set forth in this First Amended Complaint, Article I, § 28 deprives Plaintiffs of their fundamental right to freedom of speech in violation of the First Amendment.

176.    Article I, § 28 has caused, and will continue to cause, Plaintiffs to suffer undue hardship and irreparable injury.

177.    As a direct and proximate result of Article I, § 28 and its enforcement by Defendants, Plaintiffs have suffered irreparable harm, including the loss of their right to freedom of speech protected by the First Amendment, entitling them to declaratory and injunctive relief.

**FIFTH CLAIM FOR RELIEF**

**(Fourteenth Amendment—Due Process)**

178.    Plaintiffs hereby incorporate all stated paragraphs.

179.    By reason of Article I, § 28 of the Michigan Constitution, which was created, adopted, and enforced under the color of state law and authority, Defendants have deprived

- 42 -

Plaintiffs, including medical professionals; women, and in particular pregnant women; preborn human beings, including Jane Roe and similarly situated individuals; preborn human beings who are black and/or have disabilities; partially born human beings; and human beings born after surviving a failed abortion attempt, of their right to due process protected by the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

180.    Article I, § 28 creates several untenable dilemmas, forcing medical personnel and others, including Plaintiffs, to choose among opposing and impossibly inconsistent courses of action.  Because § 28 is internally inconsistent, it violates the right to due process protected by the Fourteenth Amendment.

181.    Under the Due Process Clause of the Fourteenth Amendment, no one may be required at peril of life, liberty or property to speculate as to the meaning of a law.  All are entitled to be informed as to what the law commands or forbids.  Article I, § 28 violates this fundamental principle of due process in violation of the Fourteenth Amendment.

182.    Under the Due Process Clause of the Fourteenth Amendment, no one may be deprived of "life" or "liberty" without due process of law.  Article I, § 28 deprives preborn human beings, including Jane Roe and similarly situated individuals, preborn human beings who are black and/or have disabilities, partially born human beings; and human beings born after surviving a failed abortion attempt, of the right to life and liberty without due process of law.

183.    As a direct and proximate result of Article I, § 28 and its enforcement by Defendants, Plaintiffs have suffered irreparable harm, including the loss of their right to due process protected by the Fourteenth Amendment, entitling them to declaratory and injunctive relief.

## SIXTH CLAIM FOR RELIEF

### (Guarantee Clause—Article IV, Section 4)

184.    Plaintiffs hereby incorporate all stated paragraphs.

185.    By reason of the aforementioned ballot initiative process (Proposal 3) and the outcome of this process (Article I, § 28 of the Michigan Constitution), Defendants have deprived Plaintiffs, specifically including Plaintiff Legislators, of their rights secured by Article IV, Section 4 of the United States Constitution ("Guarantee Clause") and 42 U.S.C. § 1983.

186.    The Guarantee Clause is a protector of basic individual rights.  It protects the citizens/residents of a state, such as Plaintiffs, from the tyranny of the majority.

187.    Article I, § 28, which was passed pursuant to the process of amending the Michigan Constitution, nullifies the legitimate authority of a coordinate branch of government, the Legislative Branch, by prohibiting it from regulating or governing in a broad area of the law ("reproduction") that has historically been within its legitimate domain in violation of the Guarantee Clause of the United States Constitution.

188.    As a direct result of Article I, § 28, Plaintiff Legislators have suffered a vote-nullification injury.

189.    As a direct and proximate result of Article I, § 28 and its enforcement by Defendants, Plaintiffs have suffered irreparable harm, including the loss of their rights protected by the Guarantee Clause, entitling them to declaratory and injunctive relief.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs ask this Court:

A)      to declare that Article I, § 28 of the Michigan Constitution and its enforcement violate the First and Fourteenth Amendments to the United States Constitution as set forth in this Complaint;

B)      to declare that the passage of Proposal 3 and thus Article I, § 28 of the Michigan Constitution and its enforcement violate the Guarantee Clause of the United States Constitution;

C)      to permanently enjoin the enforcement of Article I, § 28 of the Michigan Constitution;

D)      to award Plaintiffs their reasonable attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988, and other applicable law;

E)      to grant such other and further relief as this Court should find just and proper.

Respectfully submitted,

AMERICAN FREEDOM LAW CENTER

/s/ *Robert J. Muise*
Robert J. Muise, Esq. (P62849)
PO Box 131098
Ann Arbor, Michigan 48113
Tel: (734) 635-3756; Fax: (801) 760-3901
rmuise@americanfreedomlawcenter.org

/s/ *David Yerushalmi*
David Yerushalmi, Esq.* (Ariz. Bar No. 009616;
DC Bar No. 978179; Cal. Bar No. 132011;
NY Bar No. 4632568)
1901 Pennsylvania Avenue NW, Suite 201
Washington, D.C. 20006
Tel: (646) 262-0500; Fax: (801) 760-3901
dyerushalmi@americanfreedomlawcenter.org
*Attorneys for Plaintiffs*

GREAT LAKES JUSTICE CENTER

/s/ *William Wagner*
William Wagner, Esq. (P79021)
5600 W. Mount Hope Highway
Suite 2
Lansing, Michigan 48917
Tel: (517) 993-9123
prof.wwjd@gmail.com
*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 20, 2024, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the court's electronic filing system.  Parties may access this filing through the court's system.  I further certify that a copy of the foregoing has been served by ordinary U.S. mail upon all parties for whom counsel has not yet entered an appearance electronically: None.

AMERICAN FREEDOM LAW CENTER

*/s/ Robert J. Muise*
Robert J. Muise, Esq.