UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RIGHT TO LIFE OF MICHIGAN; AMERICAN ASSOCIATION OF PRO-LIFE OBSTETRICIANS AND GYNECOLOGISTS, on behalf of itself, its members, and their patients; GINA JOHNSEN, Representative, Michigan House of Representatives; LUKE MEERMAN, Representative, Michigan House of Representatives; JOSEPH BELLINO, JR., Senator, Michigan Senate; MELISSA HALVORSON, M.D.; CHRISTIAN MEDICAL AND DENTAL ASSOCIATIONS, on behalf of itself, its members, and their patients; CROSSROADS CARE CENTER; CELINA ASBERG; GRACE FISHER; JANE ROE, a fictitious name on behalf of preborn babies; ANDREA SMITH; JOHN HUBBARD; LARA HUBBARD; SAVE THE 1, on behalf of itself and its members; and REBECCA KIESSLING,

     Plaintiffs,

v

GRETCHEN WHITMER, in her official capacity as Governor of the State of Michigan; DANA NESSEL, in her official capacity as Attorney General of the State of Michigan; and JOCELYN BENSON, in her official capacity as Secretary of State of the State of Michigan,

    Defendants.

No. 1:23-cv-01189

HON. PAUL L. MALONEY

MAG. JUDGE RAY KENT

**BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

**ORAL ARGUMENT REQUESTED**

---

Robert J. Muise (P62849)
David Yerushalmi (Ariz. Bar No. 009616; DC Bar No. 978179; Cal. Bar No. 132011; NY Bar No. 4632568)
American Freedom Law Center
Attorneys for Plaintiffs
P.O. Box 131098, Ann Arbor, MI 48113
(734) 635-3756
rmuise@americanfreedomlawcenter.org
dyerushalmi@americanfreedomlawcenter.org

Linus Banghart-Linn (P73230)
Kyla Barranco (P81082)
Rebecca Aboona (P81977)
Attorneys for Defendants
Mich. Dep't of Attorney General
P.O. Box 30212
Lansing, MI 48909
(517) 335-7622
Banghart-LinnL@michigan.gov
BarrancoK@michigan.gov
AboonaR1@michigan.gov

William Wagner (P79021)
Great Lakes Justice Center
Attorney for Plaintiffs
5600 W. Mount Hope Highway
Suite 2
Lansing, MI 48917
(517) 993-9123
Prof.wwjd@gmail.com

_____

**BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' FIRST AMENDED COMPLAINT**

**ORAL ARGUMENT REQUESTED**

Kyla Barranco (P81082)
Linus Banghart-Linn (P73230)
Rebecca Aboona (P81977)
Attorneys for Defendants Whitmer,
Nessel, and Benson
P.O. Box 30212
Lansing, MI 48909
BarrancoK@michigan.gov
Banghart-LinnL@michigan.gov
AboonaR1@michigan.gov
(517) 335-7622

Dated:  March 19, 2024

# TABLE OF CONTENTS

Page

Table of Contents ..................................................................................... i

Index of Authorities ................................................................................ iv

Concise Statement of Issues Presented .................................................. xiii

Controlling or Most Appropriate Authority ........................................... xiii

Introduction ............................................................................................ 1

Statement of Facts .................................................................................. 3

    *Roe v. Wade* and its progeny .............................................................. 3

    *Dobbs v. Jackson Women's Health Organization* and the aftermath ............. 3

    Michigan's answer:  Proposal 3 ........................................................... 3

    The Original Complaint ....................................................................... 5

    The Amended Complaint ..................................................................... 6

Standards of Review ............................................................................... 7

Argument ................................................................................................ 8

I.    Plaintiffs do not have standing to assert any of their claims ........................ 8

    A.    Plaintiffs fail to show an injury-in-fact. ................................................ 8

        1.    The individual Plaintiffs do not have standing to challenge either § 28 or Proposal 3. ............................................. 9

            a.    Plaintiff-Legislators allege only institutional injuries, which are insufficient to show an injury-in-fact ................................................. 9

            b.    Dr. Halvorson's fears are both hypothetical and unfounded ........................................................ 13

            c.    Asberg and Fisher have not and cannot show that they will imminently suffer an injury-in-fact as a result of § 28 ...................................................... 17

i

         d.    Kiessling, a concerned bystander, alleges no cognizable injury. ............................................................... 19

         e.    Plaintiff-Parents' claims are based on a speculative chain of possibilities, which is insufficient to demonstrate standing. ...................................................... 20

         f.    Jane Roe is not a "person" under the Fourteenth Amendment and thus does not have standing. ............... 22

    2.    Plaintiff-Organizations do not have standing to challenge either § 28 or Proposal 3. .......................................... 24

         a.    None of Plaintiff-Organizations have sufficiently alleged direct organizational injuries. ........................... 25

         b.    Neither AAPLOG, Crossroads, CMDA, nor Save the 1 have representational standing.................................... 28

B.    Plaintiffs' purported injuries are neither fairly traceable to Defendants nor likely to be redressed by this Court. .......................... 30

II.    Plaintiffs' claims are not ripe for review. ......................................................... 33

III.    Plaintiffs cannot overcome Defendants' Eleventh Amendment immunity. ......................................................................................... 34

IV.    Plaintiffs fail to state a claim on which relief can be granted...................... 38

A.    Plaintiffs fail to allege any state action interfering with a right guaranteed by the U.S. Constitution..................................................... 39

B.    Each individual claim is facially defective. ........................................... 43

    1.    Plaintiffs fail to state a plausible claim under the Equal Protection Clause................................................................. 43

         a.    Article I, § 28 is not discriminatory. ............................... 43

         b.    Fetuses do not possess equal protection rights. .............. 46

    2.    Plaintiff-Parents fail to sufficiently allege a deprivation of their parental rights.................................................................. 49

    3.    Plaintiffs fail to state a claim under the Free Exercise Clause........................................................................................ 53

4.      Plaintiffs' free speech claim is inadequately pled. .................... 57

5.      Plaintiffs fail to state a plausible due process claim................. 59

6.      Plaintiffs' Guarantee Clause claim is a nonjusticiable
        political question......................................................... 62

Conclusion and Relief Requested ............................................................... 63

# INDEX OF AUTHORITIES

Page

**Cases**

*Abele v. Markle,*
    351 F. Supp. 224 (D. Conn. 1972) .................................................................. 48, 49

*Adult Video Ass'n v. U.S. Dep't of Justice,*
    71 F.3d 563 (6th Cir. 1995) ...................................................................................... 33

*Alaska Legis. Council v. Babbitt,*
    181 F.3d 1333 (D.C. Cir. 1999) .............................................................................. 10

*Am. Atheists, Inc. v. City of Detroit Downtown Dev. Auth.,*
    567 F.3d 278 (6th Cir. 2009) .................................................................................. 56

*Am. Mfrs. Mut. Ins. Co. v. Sullivan,*
    526 U.S. 40 (1999) ...................................................................................................... 40

*Anspach v. City of Philadelphia, Department of Public Health,*
    503 F.3d 256 (3d Cir. 2007) .................................................................................... 51

*Arizona State Legislature v. Arizona Independent Redistricting Commission,*
    576 U.S. 787 (2015) .................................................................................................. 12

*Ashcroft v. Am. Civil Liberties Union,*
    535 U.S. 564 (2002) .................................................................................................. 57

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ................................ xiii, 7, 38, 41, 42, 46, 49, 52, 55, 57, 58, 61

*Ass'n of Am. Physicians & Surgeons v. FDA,*
    13 F.4th 531 (6th Cir. 2021) ........................................................ 8, 14, 17, 29, 30

*Baird v. Norton,*
    266 F.3d 408 (6th Cir. 2001) .................................................................................. 10

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ...........................................................................xiii, 7, 58, 59

*Bigelow v. Mich. Dep't of Nat. Res.,*
    970 F.2d 154 (6th Cir. 1992) .................................................................................. 33

*Black v. Gordon*,
   No. 1:20-cv-1143, 2021 WL 5334372 (W.D. Mich. Feb. 25, 2021) .......................... 59

*Bowen v. Roy*,
   476 U.S. 693 (1986) ......................................................................... 53, 54

*Byrn v. N.Y. City Health & Hosps. Corp.*,
   329 N.Y.S.2d 722 (N.Y. App. Div. 1972)................................................... 48

*California v. Texas*,
   593 U.S. 659 (2021) ............................................................................. 32

*Cartwright v. Garner*,
   751 F.3d 752 (6th Cir. 2014) ................................................................... 7

*Children's Healthcare is a Legal Duty, Inc. v. Deters*,
   92 F.3d 1412 (6th Cir. 1996) .................................................................. 35

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
   508 U.S. 520 (1993) ......................................................................... 53, 54

*City of Cleburne v. Cleburne Living Ctr.*,
   473 U.S. 432 (1985) .............................................................................. 43

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ................................................................. 9, 21, 30, 31

*Coleman v. Miller*,
   307 U.S. 433 (1939) .......................................................................... 12, 13

*Courser v. Mich. House of Representatives*,
   404 F. Supp. 3d. 1125 (W.D. Mich. 2019).................................................. 59

*Coyne v. Am. Tobacco Co.*,
   183 F.3d 488 (6th Cir. 1999) ................................................................... 8

*Crawford v. U.S. Dep't of Treasury*,
   868 F.3d 438 (6th Cir. 2017) .............................................................. 12, 17

*Ctr. for Law & Educ. v. Dep't of Educ.*,
   396 F.3d 1152 (D.C. Cir. 2005) .............................................................. 26

*Diaz v. Mich. Dep't of Corrs.*,
   703 F.3d 956 (6th Cir. 2013) .............................................................. 35, 37

*Disability Rights S.C. v. McMaster*,
   24 F.4th 893 (4th Cir. 2022) ................................................................... 35

*Dobbs v. Jackson Women's Health Org.,*
  597 U.S. 215 (2022) ........................................................................... 1, 3, 47

*Doe v. Bolton,*
  410 U.S. 179 (1973) ................................................................................ 48

*Doe v. DeWine,*
  910 F.3d 842 (6th Cir. 2018) ................................................................. 37

*Doe v. Holcomb,*
  883 F.3d 971 (7th Cir. 2018) ................................................................. 36

*Doe v. Irwin,*
  615 F.2d 1162 (6th Cir. 1980) .......................................................... 50, 51

*Doe v. Mich. Dep't of State Police,*
  490 F.3d 491 (6th Cir. 2007) ................................................................. 56

*Dynalantic Corp. v. Dep't of Defense,*
  115 F.3d 1012 (D.C. Cir. 1997) ............................................................. 31

*Emp't Div., Dep't of Human Res. of Oregon v. Smith,*
  494 U.S. 872 (1990) ........................................................................... 53, 54

*Ex parte Young,*
  209 U.S. 123 (1908) .................................................................. xiii, 2, 35, 37

*Fair Elections Ohio v. Husted,*
  770 F.3d 456 (6th Cir. 2014) ...................................................... 27, 28, 45

*Fair Hous. Council of Suburban Phila. v. Montgomery Newspapers,*
  141 F.3d 71 (3d Cir. 1998) ..................................................................... 28

*FCC v. Beach Commc'ns, Inc.,*
  508 U.S. 307 (1993) ................................................................................ 56

*Fulton v. City of Phila.,*
  593 U.S. 522 (2021) ................................................................................ 55

*Grendell v. Ohio Sup. Ct.,*
  252 F.3d 828 (6th Cir. 2001) .............................................................. 8, 21

*Havens Realty Corp. v. Coleman,*
  455 U.S. 363 (1982) ................................................................................ 26

*Heller v. Doe,*
  509 U.S. 312 (1993) ................................................................................ 56

*Hudgens v. NLRB.,*
    424 U.S. 507 (1976) ............................................. 39

*Jackson v. Snyder,*
    No. 1:12-cv-1364, 2013 WL 1818775 (W.D. Mich. Apr. 29, 2013) ......................... 22

*John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.,*
    78 F.4th 622 (4th Cir. 2023) ............................ 20

*Kowalski v. Tesmer,*
    543 U.S. 125 (2004) ........................................... 22

*Ky. Press Ass'n, Inc. v. Kentucky,*
    454 F.3d 505 (6th Cir. 2006) ......................... 33

*Lipman v. Budish,*
    974 F.3d 726 (6th Cir. 2020) ......................... 14

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ........................... xiii, 8, 9, 18, 30

*Massachusetts v. Mellon,*
    262 U.S. 447 (1923) ........................................... 32

*McGarvey v. Magee-Womens Hosp.,*
    340 F. Supp. 751 (W.D. Pa. 1972) ................ 47

*McInnes-Misenor v. Me. Med. Ctr.,*
    211 F. Supp. 2d 256 (D. Me. 2002) .............. 18

*MedImmune, Inc. v. Genentech, Inc.,*
    549 U.S. 118 (2007) ........................................... 13

*Mendez v. Heller,*
    530 F.2d 457 (2d Cir. 1976) .......................... 36

*Meyer v. Nebraska,*
    262 U.S. 390 (1923) ........................................... 50

*Mich. Ass'n of Pub. Sch. Acads. v. U.S. Dep't of Educ.,*
    No. 1:22-cv-712, 2024 WL 455079 (W.D. Mich. Jan. 10, 2024) ........................... 29

*Moir v. Greater Cleveland Reg'l Transit Auth.,*
    895 F.2d 266 (6th Cir. 1990) ........................... 7

*Nat'l Pride at Work, Inc. v. Governor of Mich.,*
    732 N.W.2d 139 (Mich. Ct. App. 2007) ................ 15

*Nat'l Rifle Ass'n of Am. v. Magaw,*
 132 F.3d 272 (6th Cir. 1997) ...................................................... 8, 13

*Nichols v. Muskingum Coll.,*
 318 F.3d 674 (6th Cir. 2003) ............................................................ 7

*Pacific States Tel. & Telegraph Co. v. Oregon,*
 223 U.S. 118 (1912) ....................................................................... 62

*Parents Protecting Our Children, UA v. Eau Claire Area Sch. Dist.,*
 657 F. Supp. 3d 1161 (W.D. Wis. 2023) ....................................... 20

*Parents United for Better Schs., Inc. v. Sch. Dist. of Phila. Bd. of Educ.,*
 148 F.3d 260 (3d Cir. 1998) .......................................................... 52

*Pennhurst State Sch. & Hosp. v. Halderman,*
 465 U.S. 89 (1984) ........................................................................ 35

*Phillips v. Snyder,*
 836 F.3d 707 (6th Cir. 2016) ........................................................ 62

*Pierce v. Society of Sisters,*
 268 U.S. 510 (1925) ...................................................................... 50

*Planned Parenthood of Mich. v. Attorney General,*
 No. 22-000044-MM (Mich. Ct. Cl. Sept. 7, 2022) .......................... 4

*Planned Parenthood of Southeastern Pennsylvania v. Casey,*
 505 U.S. 833 (1992) ................................................................. 46, 47

*Prince v. Massachusetts,*
 321 U.S. 158 (1944) ...................................................................... 50

*Raines v. Byrd,*
 521 U.S. 811 (1997) .......................................................... 10, 11, 13

*Reardon v. Midland Cmty. Sch.,*
 814 F. Supp. 2d 754 (E.D. Mich. 2011) ......................................... 52

*Roe v. Wade,*
 410 U.S. 113 (1973) ........................................................ 3, 14, 46, 49

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
 515 U.S. 819 (1995) ...................................................................... 57

*Rucho v. Common Cause,*
 139 S. Ct. 2484 (2019) .................................................................. 62

*Ruiz Romero v. Gonzalez Caraballo,*
    681 F. Supp. 123 (D.P.R. 1988) ................................................................ 47

*Russell v. Lundergan-Grimes,*
    784 F.3d 1037 (6th Cir. 2015) ................................................................. 37

*Scalise v. Boy Scouts of Am.,*
    692 N.W.2d 858 (Mich. Ct. App. 2005) ................................................. 15

*Scarbrough v. Morgan Cnty. Bd. of Educ.,*
    470 F.3d 250 (6th Cir. 2006) ................................................................. 43

*Shelby Advocs. for Valid Elections v. Hargett,*
    947 F.3d 977 (6th Cir. 2020) ................................................................. 28

*Shell Oil Co. v. Noel,*
    608 F.2d 208 (1st Cir. 1979) ................................................................. 36

*Shelley v. Kraemer,*
    334 U.S. 1 (1948) .................................................................................... 39

*Sierra Club v. Morton,*
    405 U.S. 727 (1972) ................................................................................ 26

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) .................................................................................. 30

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield,*
    552 F.3d 430 (6th Cir. 2008) ................................................................... 7

*Traverse Bay Area Intermediate Sch. Dist. v. Mich. Dep't of Educ.,*
    615 F.3d 622 (6th Cir. 2010) ................................................................... 7

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
    582 U.S. 449 (2017) ........................................................................ 53, 54

*Turner Broadcasting Sys., Inc. v. FCC,*
    512 U.S. 622 (1994) ................................................................................ 57

*United Food & Comm. Workers Union Local 751 v. Brown Grp., Inc.,*
    517 U.S. 544 (1996) ................................................................................ 25

*United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l
    Transit Auth.,*
    163 F.3d 341 (6th Cir. 1998) ................................................................. 60

*United States v. Morrison,*
    529 U.S. 598 (2000) ................................................. 39

*United States v. Students Challenging Regul. Agency Procs. (SCRAP),*
    412 U.S. 669 (1973) ................................................. 19

*United States v. Vuitch,*
    402 U.S. 62 (1971) ................................................. 48

*United Steelworkers, Local 2116 v. Cyclops Corp.,*
    860 F.2d 189 (6th Cir. 1988) ................................................. 33

*Universal Life Church Monastery Storehouse v. Nabors,*
    35 F.4th 1021 (6th Cir. 2022) ........................................ 31, 32

*Village of Arlington Heights v. Metro. Housing Dev. Corp.,*
    429 U.S. 252 (1977) ................................................. 44

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
    455 U.S. 489 (1982) ................................................. 60

*Village of Willowbrook v. Olech,*
    528 U.S. 562 (2000) ................................................. 43

*Warth v. Seldin,*
    422 U.S. 490 (1975) ........................................ 11, 25, 29

*Wayte v. United States,*
    470 U.S. 598 (1985) ................................................. 44

*Whitmer v. Linderman,*
    No. 220193498-CZ (Mich. Cir. Ct. Aug. 1, 2022).................... 4

*Whitmore v. Arkansas,*
    495 U.S. 149 (1990) ................................................. 23

*Will v. Mich. Dep't of State Police,*
    491 U.S. 58 (1989) ................................................. 35

*Wilson v. NLRB,*
    920 F.2d 1282 (6th Cir. 1990) ................................................. 39

*Wisconsin v. Yoder,*
    406 U.S. 205 (1972) ................................................. 50

*Woodland v. Mich. Citizens Lobby,*
    378 N.W.2d 337 (Mich. 1985)............................ 15, 19, 30, 41, 54, 55, 58

## Statutes

42 U.S.C. § 238n(a) ........................................................................... 16, 30

Mich. Comp. Laws § 330.1128 .......................................................... 16

Mich. Comp. Laws § 333.20182 .................................................... 15, 30

Mich. Comp. Laws § 333.26103 ........................................................ 13

Mich. Comp. Laws § 37.2101 *et seq.* ................................................. 40

Mich. Comp. Laws § 390.4 ................................................................. 16

Mich. Comp. Laws § 445.901 *et seq.* ................................................. 36

Mich. Comp. Laws § 750.14 ................................................................. 4

Reproductive Health Act, 2023 PA 286 ........................................... 13

## Other Authorities

*Ballot Proposal 3 of 2022* .................................................................. 4

Health & Human Services, *State Operated Inpatient Psychiatric Hospitals* ........... 16

Official Record, Constitutional Convention 1961 .............................. 15

University of Michigan Health, *U-M Health Board* ........................... 16

## Rules

Fed. R. Civ. P. 12(b)(1) ............................................................... xiii, 7

Fed. R. Civ. P. 12(b)(6) ..................................................... xiii, 7, 45, 58

Fed. R. Civ. P. 17(c) ......................................................................... 23

Fed. R. Civ. P. 17(c)(2) ..................................................................... 23

Fed. R. Civ. P. 23 ............................................................................. 22

**Constitutional Provisions**

Mich. Const. art. I, § 27 .................................................................... 24, 48, 61

Mich. Const. art. I, § 28 ...................................... xiii, 1, 4, 24, 29, 30, 44, 48, 55, 56, 61

Mich. Const. art. I, § 28(1) ................................................................................ 5

Mich. Const. art. I, § 28(2) ...................................................................... 40, 44, 58

Mich. Const. art. I, § 28(3) ........................................................................... 5, 18

Mich. Const. art. I, § 28(4) ................................................................................ 5

Mich. Const. art. VIII, § 5 ............................................................................... 16

Mich. Const. art. XII, § 2 ............................................................................. 4, 32

U.S Const. amend. XIV, § 1 ........................................................................... 43

U.S. Const. amend. I ................................................................................. 53, 57

U.S. Const. art. IV, § 4 ................................................................................... 9

## CONCISE STATEMENT OF ISSUES PRESENTED

1.     Do Plaintiffs, who have suffered no actual injuries and face no imminent harm or substantial risk of harm, have standing to maintain their claims?

2.     Are Plaintiffs' speculative disagreements with a right enshrined in the Michigan Constitution ripe for review?

3.     Are Defendants, who Plaintiffs allege have done nothing beyond possess general executive authority, entitled to Eleventh Amendment immunity?

4.     Does the amended complaint, which fails to allege state action that infringes on Plaintiffs' rights, state plausible claims for relief under the Equal Protection, Due Process, Free Exercise, Free Speech, or Guarantee Clauses of the U.S. Constitution?

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

*Authority*:     Mich. Const. art. I, § 28;

Fed. R. Civ. P. 12(b)(1) and (6);

*Ex parte Young*, 209 U.S. 123 (1908);

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992);

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007);

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

**INTRODUCTION**

In 2022, as it overturned nearly 50 years of federal precedent protecting reproductive liberty, the U.S. Supreme Court emphasized that it was returning the question of whether and how to regulate abortion to the States: "The permissibility of abortion, and the limitations, upon it, are to be resolved like most important questions in our democracy: by citizens trying to persuade one another and then voting." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 232 (2022) (quotations omitted). That same year, Michigan accepted the Court's invitation— the question was placed on the ballot, citizens tried to persuade one another, and then they voted. And the People's resounding choice was to explicitly enshrine the right to reproductive freedom in Article I, § 28 of the Michigan Constitution.

Now, Plaintiffs (a group of pro-life organizations and individuals) seek to subvert the will of the People and strike down the right to reproductive freedom as violating the U.S. Constitution. This effort—Plaintiffs' second bite at the apple after amending their complaint in an attempt to cure the plethora of defects contained therein—should fail at the outset for the same four reasons that their original complaint was deficient.

*First*, each and every Plaintiff lacks standing. The claims rise and fall on conjecture and hypothetical scenarios, which may never come to pass. Plaintiffs spend pages theorizing about how § 28 *might* be applied to them, but their allegations remain just that—theoretical. No Plaintiff has been regulated or otherwise harmed by § 28 since its passage sixteen months ago, nor has any Plaintiff demonstrated that a harm is imminent or at a substantial risk of

1

occurring.  While Plaintiffs oppose § 28 and the voter-initiated Proposal that led to it, this distaste is woefully insufficient to demonstrate standing.  On this basis alone, the amended complaint should be dismissed.

*Second*, and similarly, Plaintiffs' claims are not ripe for review.  As with standing, the ripeness doctrine prevents adjudication of claims anchored in speculative future events that may not occur as anticipated, or at all.  Given the conjectural nature of Plaintiffs' claims, the only non-speculative allegations they assert relate to their opposition to abortion and § 28's passage, which, again, are not enough to warrant this Court's review.

*Third*, Plaintiffs' allegations fail to overcome Defendants' immunity from suit.  To fall within the *Ex parte Young* exception to immunity, Plaintiffs must allege some connection between Defendants and § 28 beyond their general executive authority.  Because Plaintiffs have not done so, they use Defendants as surrogates for the State, in contravention of the Eleventh Amendment.

And *fourth*, even disregarding these threshold jurisdictional issues, additional and equally compelling arguments support dismissal of the amended complaint for failure to state a claim.  Plaintiffs' six claims are facially defective for a variety of reasons ranging from insufficient pleading to lack of legal basis.  Their claims stretch logic—for example, asserting that a law applying to "[e]very individual" is discriminatory—and this Court should reject them.

This Court should dismiss Plaintiffs' amended complaint and uphold the will of Michigan voters.

## STATEMENT OF FACTS

### *Roe v. Wade* **and its progeny**

In 1973, the U.S. Supreme Court decided the landmark case of *Roe v. Wade*, which concluded—after engaging in a thorough analysis of the history (or relative lack thereof) of "restrictive criminal abortion laws" in the United States, on the one hand, and the well-established right to privacy conferred in the U.S. Constitution, on the other—that "the [constitutional] right of personal privacy includes the abortion decision." 410 U.S. 113, 129–47, 152–54 (1973). Subsequent cases refined the right recognized in *Roe*, but from *Roe* onward it was well understood that individuals had a fundamental right to decide to terminate their pregnancies.

### *Dobbs v. Jackson Women's Health Organization* **and the aftermath**

After nearly half a century of the recognition of such a right, the Supreme Court upended the central holding of *Roe*. In *Dobbs v. Jackson Women's Health Organization*, the Court overturned *Roe* and its progeny and removed federal protection for the long-held right, holding "that the Constitution does not confer a right to abortion." 597 U.S. 215, 292 (2022). The practical result of *Dobbs* was to subject abortion rights to a patchwork of state abortion laws, ranging from complete bans on abortion, to tight restrictions, to full protection of the right.

### **Michigan's answer:  Proposal 3**

In Michigan, *Dobbs* meant the potential revival of an extreme, decades-old statute criminalizing all abortions except those performed to preserve the life of the

3

pregnant individual.  Mich. Comp. Laws § 750.14.  To guard against this eventuality and definitively resolve the issue within this State, Michigan's voters used the constitutional initiative process to place before the electorate the question of whether and to what extent reproductive freedom should be protected in the Michigan Constitution.  *See* Mich. Const. art. XII, § 2.

The result was a proposal to amend the Michigan Constitution to add a right to reproductive freedom: Proposal 3.  In total, 753,759 signatures were submitted to the Bureau of Elections in support of Proposal 3—the most ever gathered for a ballot measure in Michigan—and the Board of State Canvassers certified Proposal 3 for placement on the ballot.[1]  On November 8, 2022, Michigan voters passed Proposal 3, with 56.7% voting in support.  (ECF No. 23, Am. Compl., PageID.159, ¶ 75.)  As a result, the Michigan Constitution was amended to add § 28 to article I.[2]  Mich. Const. art. I, § 28.

This provision, which establishes a self-executing constitutional right to reproductive freedom, provides in part as follows:

> Every individual has a fundamental right to reproductive freedom, which entails the right to make and effectuate decisions about all matters relating to pregnancy, including but not limited to prenatal care, childbirth, postpartum care, contraception, sterilization, abortion care, miscarriage management, and infertility care.

---

[1] House Fiscal Agency, *Ballot Proposal 3 of 2022*, https://www.house.mi.gov/hfa/PDF/Alpha/Ballot_Proposal_3_of_2022.pdf (last visited March 18, 2024).

[2] Before the passage of Proposal 3, two Michigan trial courts held that the state constitution's guarantees of due process and equal protection already protect reproductive liberties.  *Planned Parenthood of Mich. v. Attorney General*, No. 22-000044-MM (Mich. Ct. Cl. Sept. 7, 2022); *Whitmer v. Linderman*, No. 220193498-CZ (Mich. Cir. Ct. Aug. 1, 2022).

Mich. Const. art. I, § 28(1).  This right "shall not be denied, burdened, nor infringed upon unless justified by a compelling state interest[3] achieved by the least restrictive means."  *Id.*  The State, however, can "regulate the provision of abortion care after fetal viability"—which § 28(4) defines—"provided that in no circumstance shall the state prohibit an abortion that, in the professional judgment of an attending health care professional, is medically indicated to protect the life or physical or mental health of the pregnant individual."  *Id.*  The provision further protects the rights of individuals by prohibiting the State from: (1) "discriminat[ing] in the protection or enforcement of th[e] fundamental right"; and (2) "penaliz[ing], prosecut[ing], or otherwise tak[ing] adverse action against an individual based on their . . . pregnancy outcomes" or "against someone for aiding or assisting a pregnant individual in exercising their right to reproductive freedom with their voluntary consent."  *Id.*, § 28(3).

**The Original Complaint**

Unhappy that the will of the People did not match their own, Plaintiffs[4] (organizations and individuals who oppose abortion) filed suit for permanent

---

[3] Section 28(4) defines a state interest as a compelling "only if it is for the limited purpose of protecting the health of an individual seeking care, consistent with accepted clinical standards of practice and evidence-based medicine, and does not infringe on that individual's autonomous decision-making."  *Id.* § 28(4).

[4] Plaintiff-Organizations are Right to Life of Michigan (RTL), American Association of Pro-Life Obstetricians and Gynecologists (AAPLOG), Crossroads Care Center (Crossroads), Christian Medical and Dental Associations (CMDA), and Save the 1.  Plaintiff-Legislators are Representatives Gina Johnsen and Luke Meerman, and Senator Joseph Bellino, Jr.  Individual Plaintiffs are Dr. Melissa Halvorson, Celina

injunctive and declaratory relief against Defendants Governor Gretchen Whitmer, Attorney General Dana Nessel, and Secretary of State Jocelyn Benson, in their official capacities.  Plaintiffs alleged the following claims: (1) violation of the Equal Protection Clause; (2) violation of the Due Process Clause (right to parent); (3) violation of the Free Exercise Clause; (4) violation of the Due Process Clause (void-for-vagueness doctrine); and (5) violation of the Guarantee Clause.  (ECF No. 1.) Defendants filed a motion to dismiss, raising arguments related to justiciability (standing and ripeness), immunity, and failure to state a claim.  (ECF Nos. 17, 18.) On January 31, 2024, this Court "afford[ed] Plaintiffs the opportunity to cure the allegedly inadequate pleading by granting Plaintiffs leave to file an amended complaint."  (ECF No. 21, PageID.138.)

**The Amended Complaint**

Plaintiffs subsequently filed an amended complaint, which adds various allegations, as well as a new claim that § 28 violates the Free Speech Clause.  (ECF No. 23.)  Because Plaintiffs' amended complaint fails to cure any of the defects that Defendants pointed out in their first motion to dismiss (which this Court dismissed as moot on February 20, 2024 (ECF No. 24, PageID.188)), and because Plaintiffs' free exercise claim is facially deficient, Defendants now file this motion to dismiss Plaintiffs' amended complaint.

---

Asberg, Grace Fisher, Andrea Smith, John Hubbard, Lara Hubbard, and Rebecca Kiessling.  The proposed class also includes "all preborn babies as a class," referred to as Jane Roe.  (*See generally* ECF No. 23, PageID.145–57, ¶¶ 13–66.)

## STANDARDS OF REVIEW

This Court must dismiss a complaint if it lacks jurisdiction.  Fed. R. Civ. P. 12(b)(1).  A motion to dismiss under Rule 12(b)(1) can challenge the sufficiency of the pleadings (a facial challenge) or the factual existence of subject-matter jurisdiction (a factual challenge).  *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014).  Under a facial challenge, "the trial court takes the allegations in the complaint as true."  *Nichols v. Muskingum Coll.*, 318 F.3d 674, 677 (6th Cir. 2003).  Under a factual challenge, "the court may consider evidence outside the pleadings."  *Id.*  Under either scenario, "the plaintiff has the burden of proving jurisdiction in order to survive the motion."  *Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990).

For motions to dismiss under Rule 12(b)(6), courts read the complaint in the light most favorable to the plaintiff, accept the plaintiff's factual allegations as true, and draw all reasonable factual inferences in plaintiff's favor.  *See Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008).  But "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotations omitted); *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009) (stating that courts need not accept legal conclusions as true).  Ultimately, "[t]o survive a motion to dismiss, [a plaintiff] must allege enough facts to state a claim to relief that is plausible on its face."  *Traverse Bay Area Intermediate Sch. Dist. v. Mich. Dep't of Educ.*, 615 F.3d 622, 627 (6th Cir. 2010) (quotations omitted).

## ARGUMENT

## I.   Plaintiffs do not have standing to assert any of their claims.

Standing is a "threshold question in every federal case." *Coyne v. Am. Tobacco Co.*, 183 F.3d 488, 494 (6th Cir. 1999) (quotations omitted).  To satisfy Article III's standing requirement, Plaintiffs "(1) must have suffered some actual or threatened injury due to the alleged illegal conduct (the 'injury in fact element'); (2) the injury must be fairly traceable to the challenged action (the 'causation element'); and (3) there must be a substantial likelihood that the relief requested will redress or prevent . . . [the] injury (the 'redressability element')." *Grendell v. Ohio Sup. Ct.*, 252 F.3d 828, 832 (6th Cir. 2001).

Plaintiffs satisfy none of these requirements.  In fact, despite having another chance to clearly allege facts demonstrating why they have standing, they again rely on general and conclusory statements as opposed to specific and plausible facts supporting their theories.  *Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 543–44 (6th Cir. 2021) ("*Twombly*'s plausibility test [extends] to th[e] standing context.").  Given their failure to cure these elemental deficiencies in their complaint, dismissal is required.

## A.   Plaintiffs fail to show an injury-in-fact.

The injury-in-fact element requires that a plaintiff must have a personal stake in the matter to be adjudicated.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Abstract or hypothetical injuries are insufficient.  *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 294 (6th Cir. 1997).  Rather, a plaintiff must show

that they suffered from an "actual" injury, *Lujan*, 504 U.S. at 560, that they are "immediately in danger of sustaining some direct injury" because of the defendant's illegal conduct, *id.* at 574 (quotations omitted), or that there is a "substantial risk" that harm will occur, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013). Plaintiffs cannot show any injuries-in-fact as none of their allegations support a finding of the actual, imminent, or substantial risk of imminent injury that caselaw requires.

### 1. The individual Plaintiffs do not have standing to challenge either § 28 or Proposal 3.

The individual Plaintiffs allege various speculative harms arising from either § 28 or the passage of Proposal 3. As set forth below, none of their "injuries" satisfy Article III standing requirements.

### a. Plaintiff-Legislators allege only institutional injuries, which are insufficient to show an injury-in-fact.

Plaintiff-Legislators (Johnsen, Meerman, and Bellino) are elected members of either the Michigan House of Representatives or Michigan Senate. (ECF No. 23, PageID.149, ¶ 32.) They allege that they "have actively worked, and would like to continue their work, through the Michigan Legislature, to propose and/or pass legislation . . . designed to advance a pro-life agenda." (*Id.*) Plaintiff-Legislators assert that Proposal 3 and its outcome, § 28, violate the federal constitution's Guarantee Clause, U.S. Const. art. IV, § 4, "by prohibiting [the Legislature] from regulating or governing in a broad area of the law ('reproduction') that has

historically been within its legitimate domain[,]" and they have thus "suffered a vote nullification injury." (ECF No. 23, PageID.184, ¶¶ 187–88.)

Plaintiff-Legislators' standing to assert this claim (Claim VI) is foreclosed by *Raines v. Byrd*, 521 U.S. 811 (1997). There, six Members of Congress raised a Guarantee Clause challenge to the Line Item Veto Act, which gave the President power to " 'cancel' certain spending and tax benefit measures after he ha[d] signed them into law." *Id.* at 814. The Court's rationale in rejecting legislative standing in this context was twofold: (1) the Members had "not been singled out for specially unfavorable treatment"—the injury alleged "necessarily damage[d] all Members of Congress and both Houses of Congress equally"; and (2) the Members did "not claim that they h[ad] been deprived of something to which they *personally* [were] entitled—such as their seats as Members of Congress after their constituents had elected *them*." *Id.* In other words, the alleged injury was "not claimed in any private capacity but solely because they [we]re Members of Congress." *Id.* ("If one of the Members were to retire tomorrow, he would no longer have a claim; the claim would be possessed by his successor instead.").

The reasoning in *Raines* applies with equal force here.[5] Like the Members of Congress in *Raines*, Plaintiff-Legislators have not been specifically singled out for unfavorable treatment. Rather, the injury alleged here, the "nullific[ation] [of] the

---

[5] While *Raines* involved federal legislators, both the Sixth Circuit and the District of Columbia Circuit have applied *Raines'* holding to suits brought by state legislators. *Baird v. Norton*, 266 F.3d 408, 412 (6th Cir. 2001); *Alaska Legis. Council v. Babbitt*, 181 F.3d 1333, 1337 (D.C. Cir. 1999).

legitimate authority of a coordinate branch of government," (ECF No. 23,
PageID.184, ¶ 187)—called "the diminution of legislative power" in *Raines*, 521 U.S.
at 821—injures (if anyone) *all* representatives and senators in the Michigan
Legislature.  This is especially true considering that Plaintiff-Legislators take issue
with the way in which § 28 came into existence, through the ballot initiative
process, which not only affects all legislators equally, but also all Michiganders.
(ECF No. 23, PageID.184, ¶¶ 185, 187.)  In other words, Plaintiff-Legislators assert
a " 'generalized grievance' shared in substantially equal measure by all or a large
class of citizens[,]" which does not warrant this Court's exercise of jurisdiction.
*Warth v. Seldin*, 422 U.S. 490, 499 (1975).

Further, like the Members of Congress in *Raines*, Plaintiff-Legislators do not
claim an injury in "any private capacity but solely because they are [m]embers of"
the Michigan Legislature.  521 U.S. at 821; (ECF No. 23, PageID.149, ¶ 32).  While
Plaintiff-Legislators do not expressly state that they sue in their "official capacity"
as legislators, their allegations stem from their official positions and the activities
they would like to carry out, and could only carry out, as legislators.  (*Id.*)  Each
Plaintiff-Legislator's injury "thus runs . . . with the [legislator's] seat, a seat which
the [legislator] holds . . . as trustee for his constituents, not as a prerogative of
personal power."  *Raines*, 521 U.S. at 821 (citing The Federalist No. 62, p. 378 (J.
Madison)).  And Plaintiffs do not allege that there was any impropriety in the
democratic process that led to the passage of Proposal 3 and the subsequent
constitutional amendment.

Plaintiff-Legislators' conclusory vote-nullification allegation, (*see* ECF No. 23, PageID.184, ¶ 188), also does not save their claim.  To be sure, a narrow "exception to the general rule against legislative standing arises when the legislators are suing on a vote-nullification theory," i.e., they plausibly "allege that if their votes had been given effect, those votes would have been sufficient to defeat or enact a specific legislative action." *Crawford v. U.S. Dep't of Treasury*, 868 F.3d 438, 453–54 (6th Cir. 2017).  That narrow exception does not apply here.

*Arizona State Legislature v. Arizona Independent Redistricting Commission* demonstrates why that is the case.  576 U.S. 787 (2015).  There, in holding that the Arizona Legislature had standing, the Supreme Court distinguished the case from *Raines*.  *Id.* at 802.  It opined that, unlike *Raines*, which involved "six *individual Members* of Congress" who had "not been authorized to represent their respective Houses," *id.* at 801–02 (quotations omitted), the Arizona State Legislature itself commenced the "action after authorizing votes in both of its chambers," *id.* at 802.  The Court also analogized to *Coleman v. Miller*, 307 U.S. 433, 446 (1939), where 20 out of 40 Kansas State Senators, "whose votes would have been sufficient to defeat a resolution ratifying a proposed federal constitutional amendment," had standing to bring suit.  *Ariz. State Legislature*, 576 U.S. at 803 (quotations omitted).  Like in *Coleman*, the Court found that a vote by the Arizona Legislature would be sufficient to adopt a redistricting plan absent the constitutional amendment.  *Id.* at 803–04.

Unlike *Arizona State Legislature*, the instant case is comparable to *Raines* and distinguishable from *Coleman*.  Like in *Raines*, Plaintiff-Legislators are three

*individual* members of the Michigan Legislature who have not alleged that they have been authorized to represent their respective chambers of the Legislature.  521 U.S. at 829.  And unlike in *Coleman*, Plaintiff-Legislators have not alleged that their votes would be sufficient to adopt pro-life legislation.  307 U.S. at 446.  Nor could they as the Michigan Legislature recently enacted the Reproductive Health Act, 2023 PA 286, a package of bills aimed at *expanding* access to abortion in Michigan and which statutorily codify § 28's protections.  *See, e.g.*, Mich. Comp. Laws § 333.26103.

For these reasons, Plaintiff-Legislators still do not have standing to maintain Claim VI, and it should be dismissed.

### b.   Dr. Halvorson's fears are both hypothetical and unfounded.

Dr. Halvorson, a pro-life, board-certified physician, has also failed to allege any new allegations that would give her standing to sue.  Again, a plaintiff must allege something more than abstract or hypothetical injury.  *Magaw*, 132 F.3d at 294.  At a minimum, the dispute must "be real and substantial and admit of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts."  *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (quotations omitted).  Dr. Halvorson's injuries not only remain hypothetical and speculative, but they are also still implausible given the language of § 28.

Take, for example, her allegation that § 28 "forces her to provide . . . [abortion, gender reassignment, puberty blocking, and sterilization] in violation of her sincerely held religious beliefs and her professional medical judgment, moral values, and conscience."  (ECF No. 23, PageID.150, ¶ 33.)  Notably, Dr. Halvorson has not alleged that she has been asked to provide these medical services to any patient or that any State regulatory body has made statements or taken actions against providers who refuse to provide these services.  (*Id.* (alleging that Dr. Halvorson "fears the . . . loss of her medical license and other government-based regulatory harms"));  *Ass'n of Am. Physicians & Surgeons*, 13 F.4th at 545 (holding that the plaintiff lacked standing where "its complaint did not make a single allegation that the state medical board in Michigan has made statements or taken actions against the use of hydroxychloroquine to treat COVID-19").  Nor has Dr. Halvorson "allege[d] any prior enforcement actions against Michigan doctors" in this context, *id.*, which is relevant given that the federal right to an abortion existed for 50 years prior to *Dobbs*.  *See Roe*, 410 U.S. at 153.

But even if Dr. Halvorson had been asked to provide the services to which she objects, she does not explain how § 28 could plausibly be interpreted as compelling her to take any action.  It is well understood that "the [U.S.] Constitution concerns the actions of government, not private citizens."  *Lipman v. Budish*, 974 F.3d 726, 741 (6th Cir. 2020).  The same is true of the Michigan Constitution: "The Michigan Constitution's Declaration of Rights provisions have never been interpreted as extending to purely private conduct; these provisions have consistently been

interpreted as limited to protection against state action."[6]  *Woodland v. Mich.
Citizens Lobby*, 378 N.W.2d 337, 344 (Mich. 1985); *see also Scalise v. Boy Scouts of
Am.*, 692 N.W.2d 858, 872 (Mich. Ct. App. 2005) ("[T]he Michigan Constitution, like
the United States Constitution, only protects individuals from discriminatory state
action.") (quotations omitted); *Nat'l Pride at Work, Inc. v. Governor of Mich.*, 732
N.W.2d 139, 152 (Mich. Ct. App. 2007) ("[T]he provisions in article 1 of the
Michigan constitution contemplate limitations of *government* conduct.") (emphasis
added).  Plaintiffs have alleged nothing to support their conclusory statement that
Dr. Halvorson, as a private actor, would be compelled to provide medical services
under § 28—a provision that regulates State action in order to protect individual
rights.  And the bare injurious allegations that Dr. Halvorson does allege are
entirely speculative given that there are state and federal conscience laws
protecting physicians.  *See, e.g.*, Mich. Comp. Laws § 333.20182 ("A physician . . .
who states an objection to abortion on professional, ethical, moral, or religious
grounds, is not required to participate in the medical procedures which will result in
abortion.  The refusal . . . to participate does not create a liability for damages. . . .");

---

[6] Michigan's Constitutional Convention record also supports this conclusion.
During a debate on whether Michigan's Equal Protection Clause regulates private
action, James Kerr Pollock, the Chairman of the Committee on Rights, Suffrage,
and Elections, stated that "as a general proposition, constitutional limitations
should serve to *restrain governmental action and not define private duties*. . . ."
*Woodland v. Mich. Citizens Lobby*, 378 N.W.2d 337, 346 (Mich. 1985) (quoting
Official Record, Constitutional Convention 1961, p. 742); *see id.* (explaining that the
exchange "indicates the support of the drafters for the general proposition that the
state Declaration of Rights is concerned with governmental infringement and leaves
regulation of private conduct to the Legislature").

42 U.S.C. § 238n(a) (prohibiting discrimination based on a physician's refusal to perform abortions).

In addition to her conscience assertions, Dr. Halvorson also asserts that § 28 injures her by preventing her employment "at state-operated hospitals and medical facilities in Michigan and/or obtaining credentials/hospital privileges in such facilities."  (ECF No. 23, PageID.150, ¶ 36.)  But nothing in § 28 bars state-operated hospitals or medical facilities[7] from hiring physicians, like Dr. Halvorson, who are not willing to provide abortions.  And given the state and federal conscience-laws protecting physicians, her alleged injury is speculative at best.

Her allegations have plausibility concerns as well.  Dr. Halvorson and other Plaintiffs conflate university-operated hospitals and medical facilities, like the University of Michigan Health System, with state-operated hospitals and medical facilities.  (*Id.*, PageID.147, 150, 152, 156, 161, 182, ¶¶ 24, 36, 49, 60, 83, 173.)  But the University of Michigan has decisional-autonomy under Michigan's Constitution. *See* Mich. Const. art. VIII, § 5 (providing public universities with autonomous decision-making authority); Mich. Comp. Laws § 390.4 ("The board of regents shall constitute the body corporate, with the right, as such of suing and being sued. . . .").[8]

---

[7] While the State operates four psychiatric hospitals and one forensic center, those are the only hospitals/medical facilities that the State operates.  Health & Human Services, *State Operated Inpatient Psychiatric Hospitals* <https://www.michigan. gov/mdhhs/keep-mi-healthy/mentalhealth/mentalhealth/mentalillness> (last visited March 18, 2024); Mich. Comp. Laws § 330.1128.  Dr. Halvorson has also not alleged that she—an OBGYN and not a mental health professional—would even be willing or qualified to apply at those facilities or that they provide abortion care.

[8] *See also* University of Michigan Health, *U-M Health Board* <https://www.uofmhealth.org/u-m-health-board> (last visited March 18, 2024).

In other words, if Dr. Halvorson claims that an injury may arise from the actions of a university health system, *that* is the proper defendant—not those sued here.

Finally, to the extent Dr. Halvorson brings claims on behalf of others, such as "women and preborn babies," (ECF No. 23, PageID.150, ¶ 35), she lacks standing to do so.  While medical providers may have standing to assert claims on behalf of their patients in certain circumstances, this theory of standing "does not relieve plaintiffs of the need to independently establish their *own* Article III standing." *Ass'n of Am. Physicians & Surgeons*, 13 F.4th at 547; *Crawford*, 868 F.3d at 455 (explaining that third-party standing is "rare" and requires an injury in fact).  Dr. Halvorson's failure to establish her own standing bars at the threshold her ability to assert third-party standing.

In short, Dr. Halvorson's purported "yet-to-happen" injuries are still not "*certainly impending.*"  *Ass'n of Am. Physicians & Surgeons*, 13 F.4th at 545 (quotations omitted).  Dismissal is warranted.

### c.   Asberg and Fisher have not and cannot show that they will imminently suffer an injury-in-fact as a result of § 28.

Asberg and Fisher's claims should similarly be dismissed.  Both women believe that § 28 (1) "immunizes from legal liability anyone who aids or assists with [their] prenatal care, childbirth, all aspects of [their] pregnanc[ies], and [their] postpartum care . . . for any harm [the third parties] may commit as a result of [their] pregnanc[ies], prenatal care, delivery of [their] bab[ies] in childbirth, and postpartum care"; and (2) "lessens the standard of care" by "legally chang[ing] the

required consent for such care from informed consent to only voluntary consent."
(ECF No. 23, PageID.153, 154, ¶¶ 52, 55.)  Asberg is not pregnant but "plans to be
pregnant . . . in the future," (*id.*, PageID.153, ¶ 52), while "Fisher is currently
pregnant and plans to be pregnant . . . in the future," (*id.*, PageID.154, ¶ 53).  Both
also sue "on behalf of . . . all preborn babies as a class" and "as their next friend."
(*Id.*, PageID.154, ¶¶ 52, 55.)

Beginning with Asberg, her injuries are at worst, speculative, and at best, not
imminent.  Not only is she not currently pregnant, but it is also unknown when she
will be pregnant in the future.  This alone mandates dismissal.  *Lujan*, 504 U.S. at
560, 574; *see also McInnes-Misenor v. Me. Med. Ctr.*, 211 F. Supp. 2d 256, 260 (D.
Me. 2002) (holding that the plaintiff lacked standing because, "[f]ar from being
'actual or imminent,' the harm the [plaintiff] fear[s] is conjectural; if [the plaintiff]
never becomes pregnant, [she] will never confront it").  Indeed, "in cases in which
plaintiffs have sought injunctive relief to prevent a harm that necessarily would
befall only a pregnant individual, non-pregnancy generally has been viewed as fatal
to standing."  *McInnes-Misenor*, 211 F. Supp. 2d at 260 (collecting cases).

Fisher, while pregnant, also lacks standing for several reasons.  First, it is
speculative that she will receive care that would impose legal liability on her
providers absent § 28.  Second, and similarly, it is speculative that Fisher's medical
providers will not obtain her informed consent or that she will sustain an injury as
a result.  And third, § 28(3) does not curtail the availability of a civil action for
malpractice or other civil remedies—it merely prohibits the *State* from taking

certain actions against those who aid or assist a pregnant individual in exercising the right to reproductive freedom in a way in which the individual has consented. *See Woodland*, 378 N.W.2d at 344.

### d. Kiessling, a concerned bystander, alleges no cognizable injury.

Kiessling has also suffered no cognizable injury as a result of § 28. As president of Save the 1, she "spends much of her time and talent advocating for laws that strictly limit the availability of abortion" because those laws prevented her mother from having an abortion while pregnant with Kiessling. (ECF No. 23, PageID.157, ¶ 66.) Because § 28 is purportedly "the most permissive abortion law in the country," she alleges that it undermines her advocacy efforts. (*Id.*)

In essence, Kiessling is alleging that § 28 is inconsistent with her values, and this is plainly a non-cognizable injury. To the extent standing could be premised on a disagreement with a law, the courts would be flooded with "controversies" satisfying Article III requirements. Unsurprisingly, the Supreme Court has closed the door on this type of injury, holding that the judicial process cannot be "a vehicle for the vindication of the value interests of concerned bystanders." *United States v. Students Challenging Regul. Agency Procs. (SCRAP)*, 412 U.S. 669, 687 (1973). Kiessling is just that—a concerned bystander who is attempting to use this Court to vindicate her personal values. This Court should dismiss her claims.

19

   **e.   Plaintiff-Parents' claims are based on a speculative chain of possibilities, which is insufficient to demonstrate standing.**

While Plaintiff-Parents raise distinct claims, they, like the other Plaintiffs, lack standing to maintain them.

Plaintiff-Parents "are parents of minor children who attend public schools in Michigan." (ECF No. 23, PageID.155, ¶ 58.)  They claim that § 28

> removes from them the authority to control and direct the upbringing of their children by permitting school officials and others to aid and assist their children with obtaining contraception; procuring an abortion; seeking "gender reassignment," puberty blocking medication, or sterilization; and engaging in sexual intercourse or other sex acts with an adult, all without Plaintiff Parents' consent or knowledge and with impunity.

(*Id.*)  As a result of § 28, they claim that they face "a Hobson's choice of either removing their children from public school . . . or subjecting their children to sexual exploitation and related harms. . . ." (*Id.*, PageID.156, ¶ 59.)  But these allegations do not establish a cognizable injury and are therefore insufficient.

As for a current injury, Plaintiff-Parents have not alleged that any of their children sought or wish to seek contraception, an abortion, gender reassignment, puberty blocking medication, sterilization, or to engage in sexual intercourse with an adult.  *See John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 78 F.4th 622, 629–30 (4th Cir. 2023) (rejecting standing on similar grounds); *Parents Protecting Our Children, UA v. Eau Claire Area Sch. Dist.*, 657 F. Supp. 3d 1161, 1171 (W.D. Wis. 2023) (same).  They therefore do not have a current injury.

Plaintiff-Parents likewise have not alleged any facts that indicate that they have a certainly impending injury or a substantial risk of harm.  At most, their

argument rests on a highly speculative fear, the occurrence of which requires guesswork as to possible actions of various individuals.  For example, determining whether Plaintiff-Parents will *ever* sustain an injury requires the following chain of future events to occur: (1) their children must decide that they want or need one of the objectionable things identified by Plaintiff-Parents; (2) the children must approach school officials about these things, and/or school officials must affirmatively offer them; (3) the school officials must aid or assist in providing these things to the children; and (4) the officials must do so without Plaintiff-Parents' consent or knowledge.  Based on this chain of events, any determination on the likelihood of harm requires conjecture as to both the actions of the children and the actions of their school officials, regardless of their assertions of their supposed "Hobson's Choice."  In other words, Plaintiff-Parents' allegations are the type of hypothetical or speculative injuries that the Supreme Court has found insufficient to support standing.  *Clapper*, 568 U.S. at 413–14 (holding that a "speculative chain of possibilities" that "require[s] guesswork as to how independent decisionmakers will exercise their judgment" was insufficient to establish Article III standing); *see also Grendell*, 252 F.3d at 833 (finding four-step chain of events too attenuated to establish injury in fact).

For these reasons, Plaintiff-Parents' claims should be dismissed.

### f.   Jane Roe is not a "person" under the Fourteenth Amendment and thus does not have standing.

According to Plaintiffs, Jane Roe is a representation for all "children" in the womb, including Fisher's preborn baby, all preborn babies, and "babies born alive who survive a failed abortion attempt by an abortion provider."  (ECF No. 23, PageID.155, ¶ 57.)  Numerous problems are apparent with respect to these Plaintiffs' standing.

*First*, as a general matter, to the extent Plaintiffs attempt to allege a class relating to Jane Roe, they have failed to meet basic pleading requirements in that regard.  The amended complaint does not even mention Fed. R. Civ. P. 23, and none of the Plaintiffs seek class certification under that Rule.  *Jackson v. Snyder*, No. 1:12-cv-1364, 2013 WL 1818775, at *3 (W.D. Mich. Apr. 29, 2013) ("Absent class certification . . . Plaintiffs lack standing to bring claims on behalf of others.") (Maloney, J.).

*Second*, to the extent that Plaintiffs attempt to bring claims on behalf of Jane Roe, they cannot satisfy the requirements necessary to overcome the presumptive bar on third-party standing.  *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004).  In addition to the threshold requirement that a plaintiff have standing to sue in his or her own right, two additional showings are required: (1) a close relationship between the plaintiff and the third party whose rights he or she asserts; and (2) a hindrance preventing the third party from raising his or her own claim.  *Id.* at 129–30.  As explained throughout this brief, none of Plaintiffs have injuries-in-fact, and,

even if they did, they have not even attempted to allege a close relationship to a class of unborn babies or those born following a failed abortion.

*Third*, and similarly, Plaintiffs' attempt to obtain standing through a next-of-friend theory also fails.  (ECF No. 23, PageID.154, 155, ¶¶ 52, 55, 57.)  Under Fed. R. Civ. P. 17(c)(2), "[a] minor or incompetent person who does not have a duly appointed representative may sue by a next friend."  And among other requirements, caselaw mandates that "a 'next friend' must have some significant relationship with the real party in interest."  *Whitmore v. Arkansas*, 495 U.S. 149, 164 (1990).  Plaintiffs cannot meet these requirements.  As set forth in Section IV.B.1.b, Jane Roe is not a person and thus, does not fall with Fed. R. Civ. P. 17(c). And even if the class did fall within Fed. R. Civ. P. 17(c), Plaintiffs have failed to show—indeed, they have failed to even allege—that they have "some significant relationship" with Jane Roe.  *Whitmore*, 495 U.S. at 164.

*Fourth*, as it relates to Fisher's unborn baby, claims on behalf of this Plaintiff fail for the same reasons Fisher's claims fail.  *See* Section I.A.1.c.  It is speculative that Fisher will receive care that would otherwise impose legal liability on providers absent § 28 or that her providers will not obtain her informed consent, leading to an injury.  Simply put, Fisher has not alleged that her unborn baby has suffered any injuries nor has she alleged any concrete facts demonstrating an imminent injury or substantial risk to her unborn baby.  Nor can Fisher bring a claim on behalf of her unborn baby as a next friend because the unborn baby is not a "minor" or an "incompetent person" under Fed. R. Civ. P. 17(c).

23

*Fifth*, as it relates to all "preborn babies," which Plaintiffs baldly postulate include all stages of fetal development from fertilization onward, (ECF No. 23, PageID.162, ¶¶ 86–87), those Plaintiffs are not "persons" as explained in Section IV.B.1.b and thus have no cognizable rights.  This is further buttressed by Michigan's Constitution, which distinguishes between "embryos" and "fetuses," on the one hand, and "persons" and "individuals," on the other.  *See* Mich. Const. art. I, §§ 27, 28.  Plaintiffs' class of "preborn babies" thus does not have standing for claims under the Fourteenth Amendment.

*Sixth*, as it relates to "babies born alive who survive a failed abortion attempt," Plaintiffs have not identified a single person with a viable claim that fits this definition.  In fact, Plaintiffs have not alleged that a baby has been born alive following an attempted abortion in the sixteen months that have elapsed since § 28's ratification—let alone that the baby was then left to die as a result of "medical neglect."  (ECF No. 23, PageID.148, ¶ 30.)  Plaintiffs merely speculate that such a situation will occur, which is insufficient to confer standing.  Further, even if Plaintiffs had alleged such a person existed, they do not have standing to represent that person's interests for the reasons discussed above.

### 2. Plaintiff-Organizations do not have standing to challenge either § 28 or Proposal 3.

The remaining Plaintiffs—RTL, AAPLOG, Crossroads, CMDA, and Save the 1—are associations, organizations, and/or nonprofits who oppose § 28 for various reasons, none of which entitle them to relief.  Generally, an organization can have

standing to sue in one of two ways.  The organization can either assert: (1) direct

organizational standing—i.e., "standing . . . to seek judicial relief from injury to

itself and to vindicate whatever rights and immunities the association itself may

enjoy," *Warth*, 422 U.S. at 511; or (2) representative standing—i.e., standing to

"redress its members' injuries," *United Food & Comm. Workers Union Local 751 v.

Brown Grp., Inc.*, 517 U.S. 544, 552 (1996).  None of the Plaintiff-Organizations

have standing under either theory.

### a.    None of Plaintiff-Organizations have sufficiently alleged direct organizational injuries.

RTL,[9] AAPLOG, Crossroads, CMDA, and Save the 1 allege organizational

injuries.  (ECF No. 23, PageID.145–46, 151, 152, 156, ¶¶ 16, 18, 23, 39, 46, 61.)

Specifically, RTL asserts that § 28 "undermines decades of [its] work and

accomplishments" and "stands as an impenetrable barrier to promoting legislation

designed to protect women and the unborn."  (*Id.*, PageID.146, ¶ 22.)  Crossroads

maintains that § 28 "will force the organization and those who work for and/or

support it to endorse and support abortion."  (*Id.*, PageID.151, ¶ 41.)  AAPLOG and

CMDA both advocate for healthcare workers' "right of conscience[,]" which they

allege § 28 abrogates, frustrating their missions.  (*Id.*, PageID.148, 153, ¶¶ 29, 51.)

And Save the 1 maintains that § 28 "undermine[s]" its efforts to "educate everyone

---

[9] Unlike the other Plaintiff-Organizations, RTL asserts only direct organizational
standing.  (ECF No. 23, PageID.145–46, ¶¶ 13–22.)

on why all preborn children should be protected by law and accepted by society."
(*Id.*, PageID.156, 157, ¶¶ 62, 64.)

A direct injury may be established when an organization suffers an injury to
its organizational activities.  But "a mere 'interest in a problem,' no matter how
longstanding the interest and no matter how qualified the organization is in
evaluating the problem, is not sufficient by itself" to confer standing.  *Sierra Club v.
Morton*, 405 U.S. 727, 739 (1972).  In *Sierra Club*, the plaintiff—an advocacy group
"with a special interest in the conservation and the sound maintenance of the
national parks, games refuges and forests of the country"—sought to prevent a
proposed development that would "contravene federal laws and regulations
governing the preservation of national parks, forests, and game refuges."  *Id.* at 730
(quotations omitted).  The Court reasoned that this "special interest" was not
enough to demonstrate standing.  *Id.* at 739.  If it were, there would be "no objective
basis upon which to disallow a suit by any other bona fide 'special interest'
organization. . . ."  *Id.*; *see also Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d
1152, 1162 n.4 (D.C. Cir. 2005) ("[T]o hold a lobbyist/advocacy group had standing
to challenge government policy with no injury other than injury to its advocacy
would eviscerate standing doctrine's actual injury requirement.").  Thus, to
establish organizational injury, the plaintiff must show something more than an
injury to its advocacy efforts, such as a "consequent drain on the organization's
resources."  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *see also Fair*

*Elections Ohio v. Husted*, 770 F.3d 456, 461 (6th Cir. 2014) ("Harm to abstract social interests cannot confer Article III standing.").

Plaintiff-Organizations cannot meet this burden for two reasons.  First, as it relates to their general assertions about harms to their advocacy interests, (ECF No. 23, PageID.146, 148, 151, 152, 157, ¶¶ 18, 19, 22, 29, 44, 48, 64), these are precisely the sort of "special interests," "interest-advocacy," and "value interests" that *Sierra Club* and *SCRAP* found insufficient to confer standing.[10]  Second, while RTL and Crossroads have alleged that § 28 requires them to expend more of the organizations' resources, the purported diversionary actions—an increased need for "programs that assist women in crisis pregnancy situations and/or help women to choose life for their unborn baby" and "to provide care for women harmed by abortion and for . . . education and counseling efforts to convince pregnant women to choose life for their unborn babies"—do not divert resources from RTL's and Crossroads' missions.  (ECF No. 23, PageID.145, 151, ¶¶ 15, 17, 39.)  Those *are* their missions.  (*Id.*, PageID.145, ¶ 15 (RTL "has many programs that assist women in crisis pregnancy centers and/or help women choose life for their unborn baby"), PageID.150–51, ¶ 38 ("Crossroads offers a variety of medical services including pregnancy testing, ultrasounds, STD services, contraception information, early prenatal care, and post abortion medical care.").)  In other words, RTL and

---

[10] And although Crossroads additionally maintains that it will be forced to support and endorse abortion, this unsupported allegation fails for the same reasons Dr. Halvorson's allegations fail.  *See* Section I.A.1.b.

Crossroads have merely alleged that they are still advocating for the very purposes for which they were formed—to advance pro-life objectives.

Courts have rejected organizations' claims of standing in similar contexts. *See, e.g.*, *Shelby Advocs. for Valid Elections v. Hargett*, 947 F.3d 977, 982 (6th Cir. 2020) (holding that a voting rights organization did not have standing because the areas in which it alleged resource diversion were part of its mission); *Fair Hous. Council of Suburban Phila. v. Montgomery Newspapers*, 141 F.3d 71, 78 (3d Cir. 1998) (holding that organizational standing was not satisfied where the activities were "part of the [organization]'s normal day-to-day operations"). And they have found standing only where the organization "redirect[ed] its focus" in light of changing laws. *Husted*, 837 F.3d at 624. For example, in *Husted*, the Sixth Circuit held that an organization had standing where it "overhaul[ed]" its election strategy and redirected its focus to in-person voting instead of absentee voting, which required "more volunteers, time, and expenditures." *Id.* Plaintiff-Organizations have not alleged similar allegations.

Because Plaintiffs' bare and conclusory allegations are insufficient to show that § 28 has frustrated their missions by harming any of the organization's activities, all of their claims should be dismissed.

### b. Neither AAPLOG, Crossroads, CMDA, nor Save the 1 have representational standing.

AAPLOG, Crossroads, CMDA, and Save the 1 also assert representational standing on behalf of their members. To satisfy this type of standing, an

organization "must allege that its members . . . are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *Warth*, 422 U.S. at 511.  And "[g]enerally, an organizational plaintiff must identify the [members] who suffered the harm." *Mich. Ass'n of Pub. Sch. Acads. v. U.S. Dep't of Educ.*, No. 1:22-cv-712, 2024 WL 455079, at *4 (W.D. Mich. Jan. 10, 2024) (Maloney, J.).  None of the organizational Plaintiffs can meet these threshold requirements.

The representational injuries asserted by AAPLOG, Crossroads, CMDA, and the Save the 1 are similar.  The organizations allege that their members will be forced to accept or provide abortions, contrary to their consciences; they fear regulatory harms, such as the loss of medical licensure; and they assert that § 28 will harm women and babies.  (ECF No. 23, PageID.148, 151, 153, ¶¶ 29, 41, 42, 44, 51.)

These organizations, however, do not assert that their members[11] have been asked or required to provide "objectionable" care to patients.[12]  Nor do they allege that any governmental agency has taken regulatory action against their members for their failure to provide such care.  AAPLOG, Crossroads, CMDA, and Save the 1

---

[11] Apart from AAPLOG, of which Dr. Halvorson is a member, Plaintiff-Organizations fail to identify specific members of their organizations who have suffered alleged harm.  This is fatal to their representational claims. *Ass'n of Am. Physicians & Surgeons*, 13 F.4th at 543 ("[A]n organization must do more than identify a likelihood that the defendant's conduct will harm an unknown member.").

[12] Further, like Dr. Halvorson, while members of these organizations may desire to work at "state-operated hospitals and medical facilities," as previously explained, § 28 does not bar them from doing so, and even if it did, those members need to sue the University of Michigan Health System for redressable relief.

instead fear what the government *might* do *if* their members were to refuse to provide such "objectionable" care.

This hypothetical fear is not only insufficient to establish standing, *see Clapper*, 568 U.S. at 409 (holding that the mere possibility that an injury will arise in the future is not enough); *Ass'n of Am. Physicians & Surgeons*, 13 F.4th at 545 (holding that failure to allege concrete threat of regulatory harm mandated dismissal); it is also unfounded.  Again, § 28 is a limitation on state action—not purely private conduct.  *Woodland*, 378 N.W.2d at 344.  And even if that were not enough, AAPLOG, Crossroads, CMDA, and Save the 1 can point to no regulatory action taken against their members for their beliefs on providing abortion care during the 50 years in which abortion was considered a fundamental right under the federal constitution.  This makes sense as both federal and state laws provide protections for physicians' conscience-based decisions.  *See, e.g.*, Mich. Comp. Laws § 333.20182; 42 U.S.C. § 238n(a).

### B.   Plaintiffs' purported injuries are neither fairly traceable to Defendants nor likely to be redressed by this Court.

Even if Plaintiffs could satisfy the injury-in-fact requirement, they must still satisfy the two remaining standing requirements:  traceability and redressability.  To do so, they must show "a fairly traceable connection between [their injuries] and the complained-of conduct of the defendant[s]," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998), and that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision," *Lujan*, 504

U.S. at 561 (quotations omitted).  *See also Dynalantic Corp. v. Dep't of Defense*, 115 F.3d 1012, 1017 (D.C. Cir. 1997) (explaining that "redressability and traceability overlap as two sides of a causation coin").  Neither requirement is satisfied here.

As to traceability, Plaintiffs have failed to add allegations showing that their injuries stem from any of Defendants' actions.  Take, for example, Governor Whitmer, who "is sworn to uphold the Constitution and laws of the State of Michigan" and "the chief executive officer" for the State.  (ECF No. 23, PageID.158, ¶¶ 67, 68.)  As pointed out in the Defendants' initial brief, courts have held that this type of allegation is insufficient to invoke federal jurisdiction.  Plaintiffs instead must allege "specific, plausible allegations about what the Governor has done, is doing, or might do to injure" them, which they have still not done.  *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1031 (6th Cir. 2022).  The same is true for the Attorney General, against whom Plaintiffs assert similar allegations, as well as allegations that she might take "regulatory action" against them. (ECF No. 23, PageID.158, 171–73, ¶¶ 70–71, 125–27.)  But Plaintiffs do not specifically allege *how* or on what basis the Attorney General might take this "regulatory action" against them *under § 28*, and a plaintiff does not satisfy the traceability requirement when it "can only speculate" about whether a party will pursue a certain action in a specific way.[13]  *Clapper*, 568 U.S. at 413.

---

[13] And the fact that the Department of Attorney General has a Consumer Protection Team to fight consumer fraud does not change this calculus.  None of Plaintiffs have alleged that a complaint has been or threatened to be filed against them.  And to the extent a complaint were to be filed, the complaint would be investigated under

Plaintiffs' allegations against the Secretary of State are equally untenable. They allege that "she is responsible for enforcing and implementing the ballot initiative procedures set forth in Article XII, § 2 of the Michigan Constitution[,]" and thus, she was "responsible for enforcing and implementing the ballot initiative procedures that resulted in the passage of Proposal 3." (ECF No. 23, Page ID.159, ¶ 73.)  What Plaintiffs do not allege is that the Secretary of State enforced or implemented those procedures in a constitutionally deficient way such that *she* has done something, is doing something, or might do something in the future to injure Plaintiffs.  *Universal Life Church Monastery Storehouse*, 35 F.4th at 1031.

As to redressability, it is notable that, with the exception of their allegations regarding the Secretary of State, Plaintiffs seek redress for *future* injuries. Prospective relief can redress a future injury only if " 'the court [may] enjoin[ ] . . . not the execution of the [law], but the acts of the official, the [law] notwithstanding.' "  *California v. Texas*, 593 U.S. 659, 672 (2021) (quoting *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923)).  Plaintiffs have no such case. Because their injuries are not fairly traceable to any Defendant, no remedy as to those Defendants (whether an injunction or declaration) would redress Plaintiffs' purported injuries.

At bottom, Plaintiffs—both individual and organizational alike—are displeased that § 28 allows individuals to make fundamental choices about their

---

the Michigan Consumer Protection Act (MCPA), Mich. Comp. Laws § 445.901 *et seq*.—regardless of the existence of § 28—a statute that is not challenged here.  *See also* Section III.

own bodies.  But the constraints of Article III prevent Plaintiffs from relocating that value conflict from the ballot box to the courtroom.  This Court should reject these efforts to dress up moral disagreement with the choices that *other* individuals and *other* doctors might make as posing a legally cognizable harm to Plaintiffs.

## II.     Plaintiffs' claims are not ripe for review.

The ripeness doctrine, like the standing doctrine, originates from Article III's requirement that the jurisdiction of the federal courts be limited to actual cases and controversies.  *Bigelow v. Mich. Dep't of Nat. Res.*, 970 F.2d 154, 157 (6th Cir. 1992). The doctrine is "designed to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements."  *Ky. Press Ass'n, Inc. v. Kentucky*, 454 F.3d 505, 509 (6th Cir. 2006) (quotations omitted).  Questions of ripeness arise in those cases "anchored in future events that may not occur as anticipated, or at all."  *Id.* (quotations omitted).

Generally, ripeness is evaluated according to three factors: (1) the "likelihood that the harm alleged by [the] plaintiffs will ever come to pass," *United Steelworkers, Local 2116 v. Cyclops Corp.*, 860 F.2d 189, 194 (6th Cir. 1988); (2) "whether the factual record is sufficiently developed to produce a fair adjudication of the merits of the parties' respective claims," *Adult Video Ass'n v. U.S. Dep't of Justice,* 71 F.3d 563, 568 (6th Cir. 1995); and (3) the "hardship to the parties if judicial relief is denied at [this] stage" in the proceedings, *id.* (quotations omitted).

On the facts pled, Plaintiffs do not meet any of the factors required to demonstrate ripeness.  As explained in Section I, Plaintiffs' alleged harms are

entirely speculative. Plaintiffs thus do not meet the "likelihood" factor of the ripeness inquiry.

Neither do they meet the other two prongs of the test for ripeness. Aside from the fact that § 28 passed and became part of the Michigan Constitution, Plaintiffs have not alleged any events that would produce a factual record upon which to adjudicate the merits of their claims. Based on the allegations in Plaintiffs' amended complaint, no Plaintiff has been forced to provide "objectionable" services or suffered consequences resulting from their failure to do so. Nor have any Plaintiffs been provided a different standard of care than that they would have received prior to § 28's passage. The amended complaint merely alleges Plaintiffs' general opposition to abortion and other forms of reproductive care and their speculation about how they believe § 28 might be enforced.

Finally, there is little hardship to Plaintiffs in a dismissal at this time. Dismissal means only that Plaintiffs must wait to obtain adjudication of their claims if and when their injuries become real and non-speculative.

For these reasons, Plaintiffs' claims are not ripe and should be dismissed.

## III. Plaintiffs cannot overcome Defendants' Eleventh Amendment immunity.

Plaintiffs' claims fail for another threshold reason: they do not overcome Defendants' Eleventh Amendment immunity from suit. Generally, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Will v. Mich. Dep't of State Police*, 491 U.S. 58,

71 (1989).  In other words, it is a suit against the State itself, which the Eleventh Amendment generally bars.  *Id.* at 66.  One exception to this immunity is the doctrine announced in *Ex parte Young*, 209 U.S. 123 (1908), whereby "a suit challenging the constitutionality of a state official's action is not one against the State." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102 (1984).  But "[c]ourts have not read *Young* expansively." *Children's Healthcare is a Legal Duty, Inc. v. Deters*, 92 F.3d 1412, 1415 (6th Cir. 1996).  Rather, to "fall within the . . . *Young* exception, a claim must seek prospective relief to end a continuing violation of federal law." *Diaz v. Mich. Dep't of Corrs.*, 703 F.3d 956, 964 (6th Cir. 2013).  And *Young* "does not apply when a defendant state official has neither enforced nor threatened to enforce the allegedly unconstitutional state [law]." *Children's Healthcare*, 92 F.3d at 1415.  Rather, it only "abrogates a state official's Eleventh Amendment immunity when a suit challenges the constitutionality of a state official's *action*." *Id.*

Plaintiffs have failed to bring claims that fall with the *Young* exception. Take, for example, the Governor.  As noted in Section I.B, Plaintiffs have failed to plead the Governor's responsibility for the direct enforcement over § 28 beyond her general executive authority.  (ECF No. 23, PageID.158, ¶¶ 67–68.)  But "[h]olding that a state official's obligation to execute the laws is a sufficient connection to the enforcement of a challenged statute would extend *Young* beyond what the Supreme Court has intended and held." *Children's Healthcare*, 92 F.3d at 1416; *see also Disability Rights S.C. v. McMaster*, 24 F.4th 893, 902 (4th Cir. 2022) (holding that

"status as the Governor of South Carolina and [the] general duty to execute state laws" was insufficient under *Young*); *Doe v. Holcomb*, 883 F.3d 971, 976 (7th Cir. 2018) (holding that the Governor of Indiana was immune from suit where he did not "play[ ] a role in enforcing . . . the statute"); *Shell Oil Co. v. Noel*, 608 F.2d 208, 211 (1st Cir. 1979) ("The mere fact that a governor is under a general duty to enforce state laws does not make him a proper defendant in every action attacking the constitutionality of a state statute."). Because Plaintiffs have not pleaded anything beyond the Governor's general executive authority, Eleventh Amendment immunity bars suit against her.

The same is true for the Attorney General. As with the Governor, Plaintiffs cite to the Attorney General's responsibility to "enforce[ ] and uphold[ ] the Constitution and the laws of the State of Michigan." (ECF No. 23, PageID.158, ¶ 70.) This is insufficient to overcome immunity. *Mendez v. Heller*, 530 F.2d 457, 460 (2d Cir. 1976) (holding that an attorney general's "duty to support the constitutionality of state statutes and to defend actions in which the state is 'interested' " is insufficient to overcome immunity) (citations omitted). Plaintiffs also cite the Attorney General's power to enforce the MCPA, Mich. Comp. Laws § 445.901 *et seq.*, which makes it unlawful to engage in consumer fraud, and assert that § 28 "provides the mechanism and basis for enforcing this law against pro-life medical professionals." (ECF No. 23, PageID.172–73, ¶ 127.) This theory is harebrained for several reasons and chief among them is the fact that the MCPA has been on the books since 1977. Since then and regardless of § 28, the Attorney

General has had the authority to bring an action against a person or entity for violating the statute's proscriptions.  In other words, Plaintiffs' supposed fears of regulatory harms stem from § 28, and they cannot bootstrap the MCPA's enforcement provision in a blatant attempt to avoid immunity.  *Doe v. DeWine*, 910 F.3d 842, 849 (6th Cir. 2018) (holding that *Young* exception applied where the attorney general was "actively involved with administering" the challenged statute) (quotations omitted); *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1047 (6th Cir. 2015) (holding that *Young* exception applied where attorney general had jurisdiction to investigate and prosecute under challenged statute).

The allegations (or lack thereof) against the Secretary of State are even more infirm.  To start, Plaintiffs allege no connection between the Secretary of State and § 28.  Rather, the allegations against her stem only from her purported "enforce[ment] and implement[ation of] the ballot initiative procedures that resulted in the passage of Proposal 3."  (ECF No. 23, PageID.159, ¶ 73.)  Given that Proposal 3 was passed on November 8, 2022, Plaintiffs allege only a past harm against the Secretary of State, which is insufficient to bring their claims within the *Young* exception.  *Diaz*, 703 F.3d at 964.  The Secretary of State is therefore entitled to immunity for all claims against her.

In summary, it is clear that the purpose of bringing suit against Defendants was not to remedy the effects of any of *their* actions, but to use Defendants as surrogates for the State, thereby evading its Eleventh Amendment immunity.  *Young* prohibits this attempt, and dismissal is required.  *Young*, 209 U.S. at 157.

37

IV.    **Plaintiffs fail to state a claim on which relief can be granted.**

Even if Plaintiffs' claims were justiciable (they are not), and Defendants did

not have immunity (they do), the amended complaint should nevertheless be

dismissed because—as in their original complaint—Plaintiffs fail to state a claim on

which relief can be granted.

As outlined above, "[t]o survive a motion to dismiss [under Fed. R. Civ. P.

12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to

state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678

(quotations omitted).  This "plausibility" review is "a context-specific task" that

requires the reviewing court to determine whether the plaintiff has not just

"alleged," but pleaded facts sufficient to "show[ ]," an entitlement to relief that is

actually plausible, and not merely "conceivable" or "possible." *Id.* at 679, 680.

"[F]acts that are merely consistent with a defendant's liability" are not enough. *Id.*

at 678 (quotations omitted).  And in making this assessment, courts are only to

consider facts that are truly well pleaded:  They are not to take as true "legal

conclusions," including when "couched as a factual allegation," nor "mere conclusory

statements" or "naked assertions devoid of further factual enhancement." *Id.* at

678–79 (quotations omitted).

For the reasons detailed below, Plaintiffs' amended complaint fails to meet

this threshold.

### A.     Plaintiffs fail to allege any state action interfering with a right guaranteed by the U.S. Constitution.

Plaintiffs' first five claims—equal protection (Claim I), due process (Claims II and V), free exercise (Claim III), and free speech (Claim IV)—all fail for the same reason (which Defendants noted in their first motion to dismiss and Plaintiffs failed to cure):  Plaintiffs have failed to allege any state action infringing upon their rights.

Courts have long held that state action is required to establish a constitutional violation under the Fourteenth Amendment's due process and equal protection clauses and under the First Amendment's free exercise and free speech clauses.  *United States v. Morrison*, 529 U.S. 598, 621 (2000) ("[T]he Fourteenth Amendment, by its very terms, prohibits only state action."); *Shelley v. Kraemer*, 334 U.S. 1, 13 (1948) ("[T]he principle has become firmly embedded in our constitutional law that the action inhibited by the first section of the Fourteenth Amendment is only such action as may fairly be said to be that of the States."); *Wilson v. NLRB*, 920 F.2d 1282, 1290 (6th Cir. 1990) ("[T]o establish a violation of the free exercise clause an individual must first show that the *government* has placed a substantial burden on the practice of his religion.") (emphasis added); *Hudgens v. NLRB.*, 424 U.S. 507, 513 (1976) ("It is, of course, a commonplace that the constitutional guarantee of free speech is a guarantee only against abridgement by government, federal or state.").  "[S]tate action requires *both* an alleged constitutional deprivation caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom

39

the State is responsible, *and* that the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (quotations omitted).

Here, Plaintiffs allege no state action. In other words, Plaintiffs have not alleged that the State has enforced § 28 against them in any manner—let alone in a manner that deprives them of their constitutional rights. Plaintiffs' allegations, at most, merely speculate that the State might enforce § 28 against them in some manner in the future. But the methods of enforcement that Plaintiffs contemplate border on absurdity, and the amended complaint does not plausibly allege that § 28 itself is the source of Plaintiffs' feared enforcement.[14]

For instance, in an attempt to cure their original complaint's failure to adequately plead state action, Plaintiffs' amended complaint newly asserts that the State will utilize the MCPA, which prohibits deceptive business practices, and the Elliot-Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws § 37.2101 *et seq.*, which prohibits discrimination on the basis of certain protected characteristics, to enforce § 28. (ECF No. 23, PageID.172–74, ¶¶ 126–27, 130–33.) What Plaintiffs fail to recognize is that the MCPA and the ELCRA exist and may be enforced against

---

[14] For example, in an attempt to transform § 28(2) into a source of state action, Plaintiffs misstate its purpose and impact, claiming that § 28(2) "mandates [that] the state protect and enforce th[e] . . . fundamental right to reproductive freedom." (ECF No. 23, PageID.161, ¶ 83 (quotations omitted).) By its plain terms, however, and contrary to Plaintiffs' allegations, § 28(2) outlines an anti-discrimination requirement that prohibits the state from "discriminat[ing] in the protection or enforcement of th[e] fundamental right" to reproductive freedom. Mich. Const. art. I, § 28(2). Plaintiffs' attempts to distort the meaning of this provision to manufacture state action should be disregarded.

conduct that violates their provisions regardless of § 28.  In fact, as noted above, § 28 does not apply to private conduct.  *Woodland*, 378 N.W.2d at 344.[15]  The statutes—not § 28—both define the prohibited conduct and provide the enforcement mechanism.  Plaintiffs' citation of the MCPA and the ELCRA is a red herring.  Indeed, if Plaintiffs are concerned that the enforcement of the MCPA or the ELCRA may infringe on their constitutional rights, the appropriate way to raise such a claim is through a separate challenge to those statutes—not through a challenge to § 28.

The absence of any plausible, non-speculative allegation related to the enforcement of § 28 against Plaintiffs is precisely the "unadorned, the-defendant-unlawfully-harmed-me accusation" that *Iqbal* prohibits.  556 U.S. at 678.

Moreover, even if Plaintiffs have somehow been harmed by § 28, they have not attributed those "harms" to the actions of the three Defendants in this case.[16]  Plaintiffs have not alleged that the Governor, the Attorney General, or the Secretary of State have taken any action against them.  Nor have Plaintiffs

---

[15] Plaintiffs' attempt to bootstrap the ELCRA's prohibition on certain forms of discrimination into allowing for wholesale enforcement of § 28 against private individuals and entities ignores this longstanding caselaw.  (ECF No. 23, PageID.173–74, ¶¶ 132–33.)

[16] If Plaintiffs believe that University of Michigan Health System policies have harmed them, as discussed in Section I.A.1.b., the three Defendants in this case have no authority over those polices.  Such complaints must be directed at the Health System.  And, to the extent Plaintiffs are concerned that other "state-owned" medical facilities have or will harm them, they have not identified any such facilities, thus failing to meet the *Twombly* / *Iqbal* pleading standard.  These allegations—added to Plaintiffs' amended complaint—do not demonstrate state action.

plausibly alleged that the Governor, the Attorney General, or the Secretary of State threatened to enforce § 28 against Plaintiffs in a manner that would deprive them of their constitutional rights.

In this context, Plaintiffs point only to: (1) a letter signed by the Attorney General as "threaten[ing] action against crisis pregnancy centers" like Crossroads, (ECF No. 23, PageID.171–72, ¶ 125); and (2) alleged "complaints and threats of complaints" to the Michigan Department of Civil Rights (MDCR) regarding providers' refusal to provide gender affirming care, (ECF No. 23, PageID.174, ¶ 133).  The letter, which Plaintiffs conspicuously fail to cite, was an open letter to Yelp from 16 state Attorneys General praising Yelp's efforts in Texas to ensure that the public have accurate information regarding crisis pregnancy centers.  (*See* 10/23/23 Open Letter to Yelp.)[17]  At no point does the letter threaten action that would violate a crisis pregnancy center's constitutional rights—and Plaintiffs do not plausibly allege that it does.  And the allegations of "complaints and threats of complaints" to the MDCR are vague, unsupported, and untied to the action of any named Defendant taken under § 28.  Thus, Plaintiffs fail to plead sufficient facts to allow this Court to "draw the reasonable inference that the [D]efendant[s are] liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Ultimately, Plaintiffs once again fail to allege the state action necessary to sustain Claims I through V.  As such, these claims should be dismissed.

---

[17] https://portal.ct.gov/-/media/AG/Press_Releases/2023/Open-Letter-re-Crisis-Pregnancy-Centers-FINAL.pdf (last visited March 18, 2024).

**B.      Each individual claim is facially defective.**

In addition to the failure to adequately allege state action with respect to

Claims I through V, each of Plaintiffs' six claims fails on its face for the reasons set

forth below.

**1.      Plaintiffs fail to state a plausible claim under the Equal
Protection Clause.**

Plaintiffs' equal protection claim (Claim I) fails because: (1) Plaintiffs do not

adequately allege discrimination; and (2) fetuses do not possess equal protection

rights.

**a.      Article I, § 28 is not discriminatory.**

As an initial matter, the amended complaint—like the original complaint—

does not establish the disparate treatment necessary to sustain an equal protection

claim.

The Equal Protection Clause commands that "[n]o State shall . . . deny to any

person within its jurisdiction the equal protection of the laws."  U.S Const. amend.

XIV, § 1.  It "is essentially a direction that all persons similarly situated should be

treated alike," *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985),

and its guarantee extends to protection "against intentional and arbitrary

discrimination" by the State, *Village of Willowbrook v. Olech*, 528 U.S. 562, 564

(2000).  Indeed, "[t]he threshold element of an equal protection claim is disparate

treatment."  *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir.

2006).

As Plaintiffs themselves recognize, § 28, by its plain terms, applies even-handedly to "[e]very individual" in Michigan.  Mich. Const. art. I, § 28; (ECF No. 23, PageID.162, ¶ 85).  In other words, each and every person in Michigan possesses a right to reproductive freedom, without regard to any particular personal characteristic.  And, notably, § 28 expressly prohibits discrimination "in the protection or enforcement of this fundamental right."  Mich. Const. art. I, § 28(2). Because § 28 does not discriminate against any group—and, in fact, explicitly precludes such discrimination, *see id.*—Plaintiffs' equal protection claim, to the extent it raises a facial challenge, fails.

To the extent Plaintiffs raise an as-applied challenge to § 28, that claim likewise fails.  To sustain an as-applied equal protection claim, Plaintiffs cannot rely solely on disproportionate impact. *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 264–65 (1977).  Instead, Plaintiffs must demonstrate that § 28 "ha[s] a discriminatory effect *and* that it was motivated by a discriminatory purpose." *Wayte v. United States*, 470 U.S. 598, 608 (1985) (emphasis added).  Evidence of such discriminatory intent includes: (1) "the historical background of the decision, particularly if it reveals a series of official actions taken for invidious purposes"; (2) "the specific sequence of events leading up to the challenged decision"; (3) "departures from the normal procedural sequence"; (4) "substantive departures, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached"; and (5) "the legislative or administrative history, especially where there are

contemporaneous statements by members of the decisionmaking body, minutes of its meetings, or reports." *Husted*, 837 F.3d at 636 (quotations omitted).

Plaintiffs assert that § 28 discriminates against women (in particular, Black women), the "preborn," the "partially born," those "born following a failed abortion," and "those medical professionals . . . who oppose" certain forms of reproductive healthcare.  (ECF No. 23, PageID.143, 177–79, ¶¶ 6, 148–55.)  Yet Plaintiffs offer no logical explanation as to how a constitutional provision that uniformly protects "[e]very individual['s]" right to reproductive freedom effects a discriminatory impact against these groups.  Plaintiffs merely conclude, citing no evidence, that such an impact exists.[18]

Plaintiffs also fail to sufficiently plead evidence of discriminatory intent or purpose.  In newly pleaded allegations attempting to address Defendants' first motion to dismiss, Plaintiffs refer to abortion statistics, the locations of abortion clinics and, citing RTL's own resources, the "racist and eugenic roots" of abortion. (ECF No. 23, PageID.167–68, ¶ 107.)  But statistics and locations alone do nothing to demonstrate an underlying discriminatory intent or purpose.  And Plaintiffs do not explain how the asserted "racist and eugenic roots" of *abortion* could conceivably be the basis for the creation of the right to *reproductive freedom* in § 28.  Under Rule 12(b)(6), without any such factual support, this Court need not accept as true

---

[18] Plaintiffs' statistics concerning the location of abortion clinics and the percentage of Black women who have abortions has no bearing on the relative "impact" of the right to reproductive freedom, which extends equally to all persons in Michigan and neither requires, prohibits, encourages, or discourages any person from obtaining an abortion.

Plaintiffs' legal conclusion that § 28 is discriminatory, despite the fact that it is couched as a factual allegation.  *Iqbal*, 556 U.S. at 678.  For this reason, to the extent Plaintiffs assert an as-applied challenge, their equal protection claim fails.

In short, Plaintiffs have not sufficiently pled discrimination—either facial or as-applied—to establish a claim under the Equal Protection Clause.  Plaintiffs' equal protection claim should therefore be dismissed.

### b.      Fetuses do not possess equal protection rights.

Plaintiffs' equal protection claim asserted on behalf of fetuses suffers from another fundamental flaw, which Defendants noted in their first motion to dismiss, and which Plaintiffs fail to address:  A fetus does not possess equal protection rights.

Half a century ago, *Roe* decided this exact issue, expressly holding that "the word 'person,' as used in the Fourteenth Amendment, does not include the unborn." *Roe*, 410 U.S. at 158.  In his concurrence in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, Justice Stevens elaborated on this holding:

> The Court in *Roe* carefully considered, and rejected, the State's argument "that the fetus is a 'person' within the language and meaning of the Fourteenth Amendment." [410 U.S. at 156.]  After analyzing the usage of "person" in the Constitution, the Court concluded that that word "has application only postnatally." [*Id.* at 157.]  Commenting on the contingent property interests of the unborn that are generally represented by guardians ad litem, the Court noted: "Perfection of the interests involved, again, has generally been contingent upon live birth.  In short, the unborn have never been recognized in the law as persons in the whole sense." [*Id.* at 162.] Accordingly, an abortion is not "the termination of life entitled to Fourteenth Amendment protection." [*Id.* at 159.]  From this holding, there was no dissent, [*see id.* at 173]; indeed, no Member of the Court

46

has ever questioned this fundamental proposition.  Thus, as a matter
of federal constitutional law, a developing organism that is not yet a
"person" does not have what is sometimes described as a "right to life."
This has been and, by the Court's holding today, remains a
fundamental premise of our constitutional law governing reproductive
autonomy.

505 U.S. 833, 913–14 (1992) (Stevens, J., concurring).

While *Dobbs* overruled the holdings in *Roe* and *Casey* that outlined the

federal constitutional right to an abortion, it left intact *Roe* and *Casey*'s rulings

related to the inapplicability of the Equal Protection Clause to fetal life.  *See Dobbs*,

597 U.S. at 254 ("[O]ur decision is not based on any view about when a state should

regard prenatal life as having rights or legally cognizable interests."); *id.* at 263

("Our opinion is not based on any view about if and when prenatal life is entitled to

any of the rights enjoyed after birth.").

Rightly so.  *Roe* was not the first to reach the question of whether a fetus

possesses equal protection rights, nor was its conclusion an outlier.  *Ruiz Romero v.*

*Gonzalez Caraballo*, 681 F. Supp. 123, 125 (D.P.R. 1988) ("The decision in *Roe v.*

*Wade* was the culmination of actions brought on behalf of conceived yet unborn

children that had been percolating up through federal tribunals for some years.").

Indeed, in the years leading up to *Roe*, various lower courts held that the

constitutional protections of the Fourteenth Amendment do not extend to fetal life.

*E.g.*, *McGarvey v. Magee-Womens Hosp.*, 340 F. Supp. 751, 754 (W.D. Pa. 1972)

("The narrow question is whether we will afford fetal life constitutional protection.

One need not be a strict constructionist to answer this in the negative for to answer

otherwise would be to create a new administrative jungle in the name of a civil right

47

never heretofore conceived. This is a problem for the legislatures of the various states. They must decide the problems in the light of the moral issues, the conflicting rights of the mother and child, the extent of medical knowledge and the interests of the state."); *Byrn v. N.Y. City Health & Hosps. Corp.*, 329 N.Y.S.2d 722, 736 (N.Y. App. Div. 1972) ("The extent to which fetal life should be protected is a value judgment not committed to the discretion of judges but reposing instead in the representative branch of government.") (quotations omitted); *Abele v. Markle*, 351 F. Supp. 224, 228 (D. Conn. 1972), judgment vacated and remanded for consideration in light of *Roe* and *Doe v. Bolton*, 410 U.S. 179 (1973), 410 U.S. 951 ("[A] fetus is not a person within the meaning of the fourteenth amendment. There is nothing in the history of that amendment nor in its interpretation by the Supreme Court to give any support whatever to the contention that a fetus has constitutional rights.").

Moreover, other cases—while not explicitly recognizing that a fetus does not possesses equal protection rights—demonstrate that such a recognition was implied.[19] For example, in *United States v. Vuitch*, the Supreme Court avoided a void-for-vagueness challenge to a statute by construing the statute in a manner that was favorable to abortion access. 402 U.S. 62, 70–72 (1971). As *Roe* noted, the Supreme Court in *Vuitch* "would not have indulged in statutory interpretation

---

[19] Even the Michigan Constitution distinguishes between "embryos" and "fetuses," on the one hand, and "persons" and "individuals," on the other, demonstrating that embryos and fetuses are not persons or individuals in the constitutional sense. *See* Mich. Const. art. I, §§ 27 (distinguishing between "embryo" and "person"), 28 (distinguishing between "individual" and "fetus").

favorable to abortion in specified circumstances if the necessary consequence was the termination of life entitled to Fourteenth Amendment protection." *Roe*, 410 U.S. at 159; *see also Abele*, 351 F. Supp. at 228 ("If a fetus was a person with a fourteenth amendment right not to be deprived of life except by due process of law, it is inconceivable that the Court would have resolved a doubtful question of statutory construction by enlarging the situations in which such a life could be extinguished.").

Under longstanding precedent, a fetus does not possess equal protection rights.  Despite Defendants explaining this longstanding precedent in their first motion to dismiss, Plaintiffs assert no new allegations to save their claim. Consequently, Plaintiffs' contrary legal conclusion should be disregarded, *Iqbal*, 556 U.S. at 678, and the portion of Plaintiffs' equal protection claim asserting fetal rights should be dismissed for this additional reason.

In sum, Plaintiffs' equal protection claim fails for the reasons outlined above. This Court should therefore dismiss Claim I.

### 2.      Plaintiff-Parents fail to sufficiently allege a deprivation of their parental rights.

Similarly, Plaintiff-Parents fail to state a claim for deprivation of their liberty interest "to control and direct the upbringing and education of their children" (Claim II), (ECF No. 23, PageID.179, ¶ 158), because Plaintiffs have not plausibly alleged that § 28 imposes compulsory requirements or prohibitions on their

upbringing of their children—a flaw in the original complaint that Plaintiffs failed to even attempt to rectify in their amended complaint.

The linchpin of interference-with-parental-rights cases is evidence of state-based coercion. *Doe v. Irwin*, 615 F.2d 1162, 1168 (6th Cir. 1980). In other words, a deprivation of a parent's right to direct the upbringing of a child exists only where "the state . . . either . . . require[s] or prohibit[s] some activity." *Id.* In *Irwin*, the Sixth Circuit addressed the State's establishment and operation of a family planning clinic that distributed contraceptives to minors without notice to their parents. *Id.* at 1163. A group of parents sued, claiming that the lack of parental notification unconstitutionally infringed on their parental rights. *Id.*

Reviewing prior Supreme Court precedent defining parental rights, the Sixth Circuit found that, "[i]n each of the Supreme Court cases[,] the state was either requiring or prohibiting some activity." *Id.* at 1168 (citing *Meyer v. Nebraska*, 262 U.S. 390 (1923); *Pierce v. Society of Sisters*, 268 U.S. 510 (1925); *Wisconsin v. Yoder*, 406 U.S. 205 (1972); and *Prince v. Massachusetts*, 321 U.S. 158 (1944)). Contrasting those cases with the facts presented in *Irwin*, the Sixth Circuit found that the lack of state-imposed "compulsory requirements or prohibitions" was fatal to the plaintiffs' claims:

> The State of Michigan, acting through the Center and defendants, has imposed no compulsory requirements or prohibitions which affect rights of the plaintiffs. It has merely established a voluntary birth control clinic. There is no requirement that the children of the plaintiffs avail themselves of the services offered by the Center and no prohibition against the plaintiffs' participating in decisions of their minor children on issues of sexual activity and birth control. The plaintiffs remain free to exercise their traditional care, custody and

50

control over their unemancipated children. Assuming the factual findings (as opposed to assumptions) of the district court are correct, we can find no deprivation of the liberty interest of parents in the practice of not notifying them of their children's voluntary decisions to participate in the activities of the Center.

615 F.2d at 1168 (footnotes omitted).

In *Anspach v. City of Philadelphia, Department of Public Health*, the Third Circuit confronted a set of facts similar to those in *Irwin*.  503 F.3d 256 (3d Cir. 2007).  There, a minor received emergency contraception from a city health department without notification to her parents, without encouragement to consult with her parents prior to taking the emergency contraception, and without parental consent.  *Id.* at 259–60.  The minor's parents sued, claiming (among other things) that this violated their parental liberty rights.  *Id.*

Citing *Irwin* with approval, the Third Circuit concluded that "[c]ourts have recognized the parental liberty interest only where the behavior of the state actor compelled interference in the parent-child relationship."  *Id.* at 262.  Finding that the complaint was "devoid of any form of constraint or compulsion" because "no one prevented [the minor] from calling her parents before she took the pills she requested," the Third Circuit held that the plaintiff-parents could not maintain a due process violation premised on their parental rights.[20]  *Id.* at 264, 267; *see also, e.g., Parents United for Better Schs., Inc. v. Sch. Dist. of Phila. Bd. of Educ.*, 148

---

[20] In so holding, the court recognized that the state is not required to "*assist* the . . . parents or affirmatively *foster* the parent/child relationship."  *Id.* at 266.  Indeed, "[t]he Constitution does not protect parental sensibilities, nor guarantee that a child will follow their parents' moral directives."  *Id.* at 268.

F.3d 260, 276–77 (3d Cir. 1998) (finding that a condom distribution program did not violate parental rights because the program was voluntary and allowed parents to refuse their child's participation); *Reardon v. Midland Cmty. Sch.*, 814 F. Supp. 2d 754, 772 (E.D. Mich. 2011) ("Under *Irwin*, a state may not affirmatively interfere with a parent's right to direct the upbringing of that parent's child, but the Fourteenth Amendment also does not nullify a state's authority to provide for the education and care of the children living in that state.") (quotations omitted).

So too here.  Plaintiffs have not alleged that the State has, through the operation of § 28, *required* that Plaintiff-Parents' minor children engage in any activity without parental involvement.  Similarly, they have not alleged that § 28 *prohibits* Plaintiff-Parents from participating in any minor child's activity.  Nor could they, as § 28 merely grants a right to reproductive freedom.  It does not mandate that any individual—including Plaintiff-Parents' minor children—exercise that right.  The lack of any alleged coercion on behalf of the State is fatal to Plaintiff-Parents' parental-rights claim.

Plaintiffs' parental-rights claim is nothing but a "[t]hreadbare recital[ ] of the elements of a cause of action, supported by mere conclusory statements," which under *Iqbal*, "do[es] not suffice."  556 U.S. at 678.  Claim II should therefore be dismissed.

### 3. Plaintiffs fail to state a claim under the Free Exercise Clause.

Plaintiffs likewise fail to state a free exercise claim (Claim III) because they have not plausibly alleged that their religious exercise has been burdened—intentionally or otherwise.

The Free Exercise Clause provides that "Congress shall make no law . . . prohibiting the free exercise [of religion,]" U.S. Const. amend. I, and it applies to the States through the Fourteenth Amendment. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993). "The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires." *Emp't Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 877 (1990). "The Free Exercise Clause protects religious observers against unequal treatment and subjects to the strictest scrutiny laws that target the religious for special disabilities based on their religious status." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 458 (2017) (quotations omitted).

Notably, the Free Exercise Clause is not implicated where the law at issue applies only to the internal conduct of the government. *Bowen v. Roy*, 476 U.S. 693, 699 (1986). As the Supreme Court has stated, "The Free Exercise Clause simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens." *Id.*; *see also id.* ("Never to our knowledge has the Court interpreted the First Amendment to require the Government *itself* to behave in ways that the individual believes will further his or her spiritual development or that of his or her family."). Here, § 28

applies only to state action. *Woodland*, 378 N.W.2d at 344. Contrary to Plaintiffs'
bare assertion that § 28 "favors" certain medical professionals over others (*e.g.*, ECF
No. 23, PageID.180–81, ¶ 166), it does not regulate Plaintiffs' private conduct—
religiously motivated or otherwise. As such, § 28 does not trigger the Free Exercise
Clause.

Even if § 28 did regulate private conduct, it is well-understood that the Free
Exercise Clause does not grant absolute freedom to engage in any and all religiously
motivated conduct (as opposed to freedom of religious *belief*, which is absolute). *See*
*Bowen*, 476 U.S. at 699 ("Our cases have long recognized a distinction between the
freedom of individual belief, which is absolute, and the freedom of individual
conduct, which is not."). In other words, "the right of free exercise does not relieve
an individual of the obligation to comply with a valid and neutral law of general
applicability on the ground that the law proscribes (or prescribes) conduct that his
religion prescribes (or proscribes)." *Smith*, 494 U.S. at 879 (quotations omitted).

Such neutral and generally applicable laws are presumed constitutional even
when they encroach on an individual's fundamental constitutional rights. *Id.* at
878–79; *Trinity Lutheran*, 582 U.S. at 460 ("In recent years, when this Court has
rejected free exercise challenges, the laws in question have been neutral and
generally applicable without regard to religion."). Thus, the only laws implicated by
the Free Exercise Clause (and requiring the application of strict scrutiny) are those
that either "target[ ] religious conduct" or intentionally "infringe upon or restrict
practices *because of* their religious motivation." *City of Hialeah*, 508 U.S. at 533–34

(emphasis added); *see also Fulton v. City of Phila.*, 593 U.S. 522, 533 (2021) ("Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature.").

Article I, § 28 does neither.  While Plaintiffs assert that, under § 28, they must "advocate for, support, endorse, and/or provide abortion, contraception, 'gender reassignment' medication procedures, sterilization, puberty blockers, and other harmful medical procedures in violation of their sincerely held religious beliefs[,]" (ECF No. 23, PageID.180, ¶ 164); they do not sufficiently explain how § 28 could be interpreted to mandate such action or inaction.  Similarly, though Plaintiffs claim that "§ 28 favors those medical professionals that advocate for" reproductive healthcare and "disfavors those medical professionals . . . who oppose . . . based on their sincerely held religious beliefs," (ECF No. 23, PageID.180–81, ¶ 166)—the only new allegation pertaining to religious exercise in their amended complaint—apart from this conclusory statement (which, again, is a legal conclusion that this Court need not accept as true, *Iqbal*, 556 U.S. at 678), the amended complaint does not advance any plausible interpretation of § 28 that could conceivably lead to this result.

In short, Plaintiffs do not plausibly allege that § 28 intentionally targets their religious beliefs or infringes upon their religiously motivated conduct.  Nor could they, as § 28 does not apply to purely private conduct.  *Woodland*, 378 N.W.2d at 344.  Plaintiffs have failed to provide sufficient "well-pleaded facts" in support of this claim to survive a motion to dismiss.  *Iqbal*, 556 U.S. at 679.

In fact, and contrary to Plaintiffs' unsupported legal conclusions, § 28, by its plain terms, is a neutral and generally applicable law that grants a constitutional right to reproductive freedom to all individuals in Michigan.  Given this neutrality and general applicability, rational basis review applies to § 28.  *Am. Atheists, Inc. v. City of Detroit Downtown Dev. Auth.*, 567 F.3d 278, 302 (6th Cir. 2009).

Under rational basis review, a law will be upheld "if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose."  *Heller v. Doe*, 509 U.S. 312, 320 (1993).  "This standard is highly deferential; courts hold statutes unconstitutional under this standard of review only in rare or exceptional circumstances."  *Doe v. Mich. Dep't of State Police,* 490 F.3d 491, 501 (6th Cir. 2007).  Courts apply a "strong presumption" that a challenged law is valid, and plaintiffs have the heavy burden of negating "every conceivable basis" which might support the law.  *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314–15 (1993); *Heller*, 509 U.S. at 320 ("[T]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it.") (quotations omitted).

Plaintiffs have failed to do so in their amended complaint, despite the fact that Defendants alerted them to this failure in their first motion to dismiss.  Far from negating every conceivable basis which might support § 28, Plaintiffs do not even attempt to analyze the provision under any level of scrutiny, let alone rational basis review.  And, notably, § 28 survives rational basis review.  The State has a legitimate interest in ensuring that those within its borders have the right to

reproductive freedom.  And § 28—which grants that right—is rationally related to that legitimate state interest.

Ultimately, Plaintiffs' free exercise claim offers mere "labels and conclusions" and "a formulaic recitation of the elements of a cause of action."  *Iqbal*, 556 U.S. at 678 (quotations omitted).  As such, Plaintiffs fail to state a free exercise claim, and Claim III should be dismissed.

### 4.   Plaintiffs' free speech claim is inadequately pled.

In the same way their free exercise claim fails, so too does Plaintiffs' newly added free speech claim (Claim IV):  Plaintiffs do not plausibly allege that § 28 could feasibly be interpreted as targeting or restricting speech.

The First Amendment, which applies to the States through the Fourteenth Amendment, prohibits laws "abridging the freedom of speech," U.S. Const. amend. I, which "as a general matter . . . means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. Am. Civil Liberties Union*, 535 U.S. 564, 573 (2002) (quotations omitted). Accordingly, "government regulation may not favor one speaker over another[,]" and "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828– 29 (1995).  "[A] regulation neutral on its face may be content based if its manifest purpose is to regulate speech because of the message it conveys." *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 645 (1994).

Plaintiffs' free speech claim is nothing more than a sequence of far-fetched legal conclusions and a threadbare recitation of the elements of a claim under the Free Speech Clause, which does not pass muster under Rule 12(b)(6). *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678–81. Plaintiffs again assert that § 28 "favors those medical professionals that advocate for" certain forms of reproductive healthcare over those "who oppose." (ECF No. 23, PageID.181, ¶ 170.) Plaintiffs also claim that § 28 is "government-sanctioned discrimination and censorship[,]" authorizing "governmental entities" to "ban, censor, chill, regulate, or otherwise restrict" speech based on "the content and viewpoint expressed." (*Id.*, PageID.181–82, ¶¶ 171–74.)

But Plaintiffs do not bolster these conclusory allegations with any analysis of § 28 that would support such an interpretation. For example, Plaintiffs fail to discuss how § 28 would authorize discrimination, when the provision itself expressly prohibits the same. Mich. Const. art. I, § 28(2) ("The state shall not discriminate in the protection or enforcement of this fundamental right."). Plaintiffs likewise do not explain how their feared infringement on speech in the name of § 28 could exist given that, again, § 28 does not apply to private conduct. *Woodland*, 378 N.W.2d at 344. Finally, Plaintiffs do not specify how a constitutional provision that grants a fundamental right—and, notably, does not facially regulate speech in any manner—

can be interpreted as prohibiting speech that disagrees with or wishes to limit such a right.[21]

Plaintiffs' free speech claim is—at best—a "naked assertion" that "stops short of the line between possibility and plausibility of entitlement to relief." *Twombly*, 550 U.S. at 557.  As such, this Court should dismiss Claim IV.

### 5.   Plaintiffs fail to state a plausible due process claim.

Plaintiffs' due process claim (Claim V)—which appears to assert a facial void-for-vagueness argument (inadequate as originally pled and remaining essentially unchanged in the amended complaint)—fares no better.

As an initial matter, the void-for-vagueness doctrine has no application to "a provision of the Michigan Constitution that does not impose criminal liability, does not have a civil penalty provision, and does not regulate speech in any manner." *Courser v. Mich. House of Representatives*, 404 F. Supp. 3d. 1125, 1141 n.6 (W.D. Mich. 2019); *see also Black v. Gordon*, No. 1:20-cv-1143, 2021 WL 5334372, at *1 (W.D. Mich. Feb. 25, 2021) (rejecting a vagueness challenge to a provision of the Michigan Constitution and noting the dearth of federal caselaw applying "the void-for-vagueness doctrine to a provision of a state constitution") (Maloney, J.).  By its plain terms, § 28 imposes no penalties (criminal or civil) and, as outlined in Section IV.B.4, does not regulate speech; as such, the void-for-vagueness doctrine does not apply.  For this reason alone, Claim V should fail.

---

[21] For instance, Plaintiffs presumably would not argue the right to bear arms in the state or federal constitution prevents any speech advocating against such a right.

Even assuming the void-for-vagueness doctrine applied to § 28, Plaintiffs fail to sufficiently allege that the constitutional provision is impermissibly vague.  A law is void for vagueness "if its prohibitive terms are not clearly defined such that a person of ordinary intelligence can readily identify the applicable standard for inclusion and exclusion."  *United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 358–59 (6th Cir. 1998).  Significantly, "[t]he degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment."  *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982).  For example, courts have "greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe."  *Id.* at 498–99.  And "the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry."  *Id.* at 498. To succeed in a facial void-for-vagueness challenge, Plaintiffs "must demonstrate that the law is impermissibly vague in all of its applications."  *Id.* at 497.

In this case, even in the face of Defendants' arguments in response to their original complaint, Plaintiffs have failed to sufficiently allege that § 28 is impermissibly vague in *any* application—let alone in all applications.  Plaintiffs allege that § 28 creates "several untenable dilemmas" requiring them to "speculate as to the meaning of" § 28 and "choose among opposing and impossibly inconsistent courses of action."  (ECF No. 23, PageID.164–65, 183, ¶¶ 96–98, 180–81.)  But they

60

do not then explain the "dilemmas," the "speculation," or the "inconsistent courses of action."

In fact, the only allegation that could be seen as providing any sort of detail to or explanation for these conclusory statements is contained in paragraph 96 of the amended complaint:

> On one hand, § 28 expressly provides the right to "prenatal" care to "every individual"—that is, to every human being, which includes the preborn—and on the other hand, § 28 strips this individual of the most fundamental right—the right to life—by allowing abortion, which is the opposite of "prenatal care."

(*Id.*, PageID.164, ¶ 96.)  But the claimed dilemma asserted in this allegation—the ostensible incongruity between a fetus possessing both a right to prenatal care and a right to life—fails to account for the longstanding precedent holding that a fetus *does not* possess a Fourteenth Amendment right to life.  *See* Section IV.B.1.b.  Nor does this allegation explain how § 28's right to reproductive freedom could be interpreted as extending to fetuses that do not otherwise possess constitutional rights—especially when viewing the allegation in the context of the Michigan Constitution's express distinction between "embryos" and "fetuses," on the one hand, and "persons" and "individuals," on the other.  *See* Mich. Const. art. I, §§ 27, 28.  Plaintiffs' allegations—"tender[ing] naked assertions devoid of further factual enhancement[,]" *Iqbal*, 556 U.S. at 678 (quotations omitted)—do not state a void-for-vagueness claim that is plausible on its face.

At bottom, Plaintiffs' due process void-for-vagueness claim (Claim V) is insufficiently pled and should therefore be dismissed.

### 6.   Plaintiffs' Guarantee Clause claim is a nonjusticiable political question.

Finally, Plaintiffs' claim under the Guarantee Clause (Claim VI) also fails. The United States Supreme Court "has several times concluded . . . that the Guarantee Clause does not provide the basis for a justiciable claim." *Rucho v. Common Cause*, 139 S. Ct. 2484, 2506 (2019) (citing, *e.g.*, *Pacific States Tel. & Telegraph Co. v. Oregon*, 223 U.S. 118 (1912)).  Indeed, as the Sixth Circuit recently recognized, "[t]raditionally, the Supreme Court has held that claims brought under the Guarantee Clause are nonjusticiable political questions." *Phillips v. Snyder,* 836 F.3d 707, 716 (6th Cir. 2016) (quotations omitted).  Rather, "it is up to the political branches of the federal government to determine whether a state has met its federal constitutional obligation to maintain a republican form of government." *Id.* at 717.

Even Plaintiffs have conceded the nonjusticiability of this claim.  (*See, e.g.*, ECF No. 23, PageID.176, ¶ 144 (conceding that "the Guarantee Clause does not generally provide the basis for a justiciable claim").)  They provide no legal support—let alone precedent—for deviating from this conclusion here, despite Defendants pointing out this deficiency in their first motion to dismiss.  Claim VI should therefore be dismissed as nonjusticiable.

**CONCLUSION AND RELIEF REQUESTED**

Plaintiffs' first amended complaint fails to cure the elemental deficiencies identified in Defendants' initial motion to dismiss.  (ECF No. 18.)  The claims are still not justiciable (and likely never will be), are barred by the Eleventh Amendment, and fail as a matter of law.  For these reasons, this Court should dismiss the first amended complaint with prejudice.

Respectfully submitted,

*/s/ Kyla Barranco*
Kyla Barranco (P81082)
Linus Banghart-Linn (P73230)
Rebecca Aboona (P81977)
Attorneys for Defendants Whitmer, Nessel, and Benson
P.O. Box 30212
Lansing, MI 48909
BarrancoK@michigan.gov
Banghart-LinnL@michigan.gov
AboonaR1@michigan.gov
(517) 335-7622

Dated: March 19, 2024